NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANE E. ADKINS AND CHARLIE ADKINS, | Civil Action No. 09-1123(SDW) |
| Plaintiffs, | |
| v. | |
| JOHN B. SOGLIUZZO, ESQ., THE ESTATE OF MARY T. GRIMLEY, DEUTSCHE BANK D/B/A ALEX BROWN, H. THOMPSON RODMAN, L. GAYE TORRANCE, TD BANK, N.A., AND HAVEN SAVINGS BANK, | OPINION |
| Defendants. | February 9, 2010 |

**Wigenton**, **District Judge**

Defendants Deutsche Bank Securities, Inc. and H. Thompson Rodman[1] (improperly pled as Deutsche Bank, Alex Brown, and Tom Rodman, and collectively referred to as the "D.B. Defendants") move for an order dismissing the Complaint[2] and compelling arbitration of the claims asserted against the D.B. Defendants. Further, the D.B. Defendants move for an order dismissing Defendant Deutsche Bank. This Motion is decided without oral argument as permitted by Federal Rule of Civil Procedure 78.

---

[1] The Plaintiffs named H. Thompson Rodman in the Second Amended Complaint, whereas the Complaint and Amended Complaint named Tom Rodman.

[2] Because the Second Amended Complaint, which was filed after the Motion, repeats the same claims made in the Complaint against the D.B. Defendants, the Court will consider the claims set forth in the Second Amended Complaint. Interestingly, the Complaint and Amended Complaint include a Verification by Jane E. Adkins, and the Second Amended Complaint does not.

I.      JURISDICTION AND VENUE

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

II.     BACKGROUND

The D.B. Defendants move to dismiss the claims asserted against them, which appear at Counts Ten, Eleven, Twelve, Thirteen, Eighteen, Twenty-Five, and Thirty-Two of the Second Amended Complaint.[3] These claims are for negligence, malpractice, aiding in the commission of a tort, conspiracy to commit a tort, breach of fiduciary duty, and liability based on *respondeat superior*. The D.B. Defendants further move to compel arbitration of these claims pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* Finally, the D.B. Defendants move to dismiss Defendant Deutsche Bank as an improper party.

The Plaintiffs' claims against the D.B. Defendants arise from decedent Jane P. Sogliuzzo's execution of a Transfer on Death Account Agreement ("TOD Agreement") with D.B.S.I. and the accompanying Authorization Letter. (*See* Rodman Certif. Exs. A, B.) The TOD Agreement designates John Sogliuzzo as the sole beneficiary of the account, and it contains an arbitration provision. (Rodman Certif. Ex. A.)

The D.B. Defendants assert the following: Jane Sogliuzzo, then the 92 year-old mother of Jane Adkins and John Sogliuzzo, signed the TOD Agreement on October 17, 2007 (Rodman Certif. ¶¶ 4, 7). H. Thompson Rodman, who was then a Director and investment advisor for Deutsche Bank Alex Brown and Jane Sogliuzzo's broker since June 1999, brought the TOD Agreement for Jane Sogliuzzo to sign. (Rodman Certif. ¶¶

---

[3] Because the D.B. Defendants failed to state which Counts they seek to dismiss in the Motion, the Counts enumerated in this Opinion are those deciphered by the Court.

1, 2, 5.) Mr. Rodman rode the ferry to Hoboken, where he was picked up by John Sogliuzzo and taken to a Hoboken restaurant to meet Jane Sogliuzzo. (Rodman Dep. 68:14-24; Rodman Certif. ¶ 4.) Mr. Rodman certifies that during a telephone conversation with Jane Sogliuzzo, she informed him that she wished to convert her brokerage account to a transfer on death account. (Rodman Certif. ¶ 3.) Mr. Rodman found, in their 15 or so telephone conversations, Jane Sogliuzzo to be lucid and engaging, and that she appeared to fully understand the subject matter that was discussed. (Rodman Certif. ¶¶ 2-3.) Mr. Rodman certifies that he fully explained to Jane Sogliuzzo the terms and conditions of a transfer on death account as well as the ramifications of signing the TOD Agreement and Authorization Letter. (Rodman Certif. ¶ 6.) Mr. Rodman certifies that Jane Sogliuzzo "appeared to read and understand the entire document, and then signed the Agreement" and that "[s]he also reviewed the Authorization Letter before signing it." (Rodman Certif. ¶ 7.) Although John Sogliuzzo transported Jane Sogliuzzo to the restaurant meeting with Mr. Rodman, John Sogliuzzo was not present during any substantive conversation between Mr. Rodman and Jane Sogliuzzo. (Rodman Certif. ¶ 4.)

The Plaintiffs assert that the TOD Agreement was the product of John Sogliuzzo's undue influence upon his mother. (2d Am. Compl. ¶¶ 271-272.) They assert that John Sogliuzzo and Mr. Rodman agreed that Mr. Rodman would meet with Jane Sogliuzzo to make her Alex Brown account a transfer on death account that would be payable solely to John Sogliuzzo. (2d Am. Compl. ¶ 294.) The Plaintiffs allege that Mr. Rodman was the broker for John Sogliuzzo, his wife, Gaye Torrance, and their children. (2d Am. Compl. ¶¶ 100, 182, 275, 277.)

3

In support of their claims of undue influence, the Plaintiffs assert the following: The October 17, 2007 meeting occurred just over two weeks after Jane Sogliuzzo was released from the hospital following an eight-day stay. (Adkins Certif. ¶ 2(o); Adkins Certif. Ex. B.) At the time she was discharged, Jane Sogliuzzo suffered from "blurred vision due to Spiriva." (Adkins Certif. Ex. B.) Since 2007, Jane Sogliuzzo's eyes burned, so she kept them closed most of the time, even when awake. (Adkins Certif. ¶ 2(g).) According to Jane Adkins, since 2006 Jane Sogliuzzo had been able to "only read things in very large print." (Adkins Certif. ¶ 2(c).) In fact, when Jane Adkins took her mother to the same restaurant where the October 17, 2007 meeting occurred, Jane Adkins had to read the larger print menu to her mother. (Adkins Certif. ¶ 2(c).) Likewise, Jane Sogliuzzo was unable to read a large print crossword puzzle book that she received for Christmas in 2007. (Adkins Certif. ¶ 2(k)(4).)

According to Jane Adkins, Jane Sogliuzzo had no real interest in financial matters for quite some time, and she did not even open her monthly Alex Brown statements. (Adkins Certif. ¶ 2(d).) Jane Adkins certifies that John Sogliuzzo took over Jane Sogliuzzo's financial affairs. (Adkins Certif. ¶ 2(m).) John Sogliuzzo, an attorney (2d Am. Compl. ¶ 102), managed Jane Sogliuzzo's Alex Brown account (Adkins Certif. ¶ 2(e)). He also managed her other finances and paid her bills. (Adkins Certif. ¶ 2(l).) Four months after signing the TOD Agreement, Jane Sogliuzzo died. (2d Am. Compl. ¶ 108.)

The Plaintiffs contend that John Sogliuzzo's undue influence over his mother, which caused her to execute the TOD Agreement, was part of a plan by which John Sogluizzo wrongfully obtained assets from his mother and her elderly cousin, Mary

4

Grimley, as well as from their estates. (2d Am. Compl. ¶¶ 64-65, 73-75, 97, 102, 134-144, 167-181.)

## III. DISCUSSION

### A. Standard on a Motion to Compel Arbitration

The Federal Arbitration Act makes contracts to arbitrate "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Federal courts have a duty to order arbitration "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The validity of any contract requires the mutual assent of the parties. *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 287 (3d Cir. 1993) (citing *Leitner v. Braen*, 143 A.2d 256, 260 (N.J. Super. Ct. App. Div. 1958)). Mutual assent over each particular term is also required for that term to form a part of the contract. *Id.* It therefore follows that, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).

In addressing a motion to compel arbitration, a court cannot decide the question of whether or not there was an agreement to arbitrate unless there are no genuine issues of material fact. *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980). Where genuine issues of material fact exist, a court must proceed to a summary trial of that issue. 9 U.S.C. § 4. At trial, each party would have the right to a jury. *Id.* In deciding whether genuine issues of material fact exist, the party opposing a motion to compel arbitration has the benefit of all reasonable doubts and inferences, just

as that party would if subject to a summary judgment motion under Rule 56 of the Federal Rules of Civil Procedure. *Par-Knit Mills*, 636 F.2d at 54.

Here, the Plaintiffs argue that there was no true mutual assent between Jane Sogliuzzo and D.B.S.I. when they executed the TOD Agreement because John Sogliuzzo exercised undue influence over his mother. That is, the Plaintiffs argue that the arbitration provision is invalid. A person is subject to undue influence where he is prevented "from following the dictates of his own mind and will and accept[s] instead the domination and influence of another." *Pascale v. Pascale*, 549 A.2d 782, 787 (N.J. 1988) (quoting *In re Neuman's Estate*, 32 A.2d 826, 827 (N.J. 1943)).

**B. Choice-of-Law**

In order to decide whether a valid agreement to arbitrate a dispute exists, a court must decide what law would govern the formation of such a contract. In diversity cases, federal courts apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-497 (1941) (citing *Erie Railroad v. Tompkins*, 304 U.S. 64, 78 (1938). "If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue." *Rowe v. Hoffman-La Roche, Inc.*, 917 A.2d 767, 771 (N.J. 2007) (citing *Erny v. Estate of Merola*, 792 A.2d 1208, 1212 (N.J. 2002)).

Here, because the Court has subject-matter jurisdiction over the claims by virtue of diversity, the Court will apply New Jersey's choice-of-law rules. As the TOD Agreement contains a choice-of-law provision, which states that Maryland law governs

6

the Agreement,[4] the Court must begin by inquiring whether New Jersey and Maryland treat undue influence differently.

In New Jersey, anyone who receives a testamentary gift under suspicious circumstances—however slight—from a person with whom he enjoyed a confidential relationship bears the burden of establishing the absence of undue influence. *Haynes v. First Nat. State Bank of New Jersey*, 432 A.2d 890, 897 (N.J. 1981) (citing *In re Rittenhouse's Will*, 117 A.2d 401, 402 (1955).)

No such presumption of undue influence for testamentary gifts arises under Maryland law. *Conrad v. Gamble*, 962 A.2d 1007, 1018-1019 (Md. App. 2008) (citing *Upman v. Clarke*, 753 A.2d 4, 5 (Md. 2000)). *See Sellers v. Qualls*, 110 A.2d 73, 80 (Md. 1954); *Shearer v. Healy*, 230 A.2d 101, 107 (Md. 1967). Under Maryland law, suspicious circumstances and a confidential relationship are merely factors that can be used by the party alleging undue influence to meet her burden. *Conrad*, 962 A.2d at 1019 (citing *Upman*, 753 A.2d 4, 10 (Md. 2000)).

The New Jersey choice-of-law rules employ a governmental interests analysis. *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28, 32 (3d Cir. 1975) (citing *Mellk v. Sarahson*, 229 A.2d 625 (N.J. 1967)). Under this analysis, a choice-of-law provision in a contract is honored unless (1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or (2) the chosen state's law conflicts with a fundamental public policy of another state with a materially greater interest in determining the particular issue. *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992) (citing Rest. 2d Conflict of Laws § 187). A state has an interest in the litigation where a corporation that

---

[4] (Rodman Certif. Ex. A.)

is a resident of that state is a party, even if that corporation is not a domiciliary. *Performance Motorcars of Westchester, Inc. v. KPMG Peat Marwick*, 643 A.2d 39, 41 (N.J. Super. Ct. App. Div. 1994) (The Court rejected the argument that New Jersey has no interest in extending its foreseeability rule to allow plaintiff to recover because "[d]omicile is but one factor to be considered in the overall qualitative analysis of the relevant contacts.")

Here, D.B.S.I. is a resident of Maryland, so under *Performance Motorcars* there is a reasonable basis for D.B.S.I. and Jane Sogliuzzo to name Maryland as the state whose law governs the TOD Agreement. As such, the Plaintiffs have not demonstrated that Maryland bears no substantial relationship to the contract. Additionally, no party has suggested that applying Maryland's law would violate New Jersey's public policy. Thus, under *Instructional Systems*, if the parties agreed to a valid choice-of-law provision, then this Court would apply Maryland law to interpret the contract.

Of course, a choice-of-law provision in a contract will not be enforced if it is the "result of 'fraud, undue influence, or overweening bargaining power,' is 'unreasonable,' or 'violates a strong public policy.'" *Paradise Enterprises Ltd. v. Sapir*, 811 A.2d 516, 521 (N.J. Super. Ct. App. Div. 2002) (quoting, *M/S Bremen v. Zapata Off Shore Co.*, 407 U.S. 1, 10-15 (1972)). It is axiomatic that if a choice-of-law provision is not enforceable, then the parties have no agreement as to what law to apply. Rest. 2d Conflict of Laws § 188. In the absence of such an agreement, the law of the state with the most significant relationship to the transaction applies. *Id.* Which state has the most significant relationship is determined by taking into account the relevant contacts, including: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of

performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.*

Here, New Jersey has the most significant relationship to the transaction between Jane Sogliuzzo and D.B.S.I.—the TOD Agreement was signed in New Jersey, Jane Sogliuzzo was a resident of New Jersey, and the sole effect of the transaction was to name John Sogliuzzo, a resident of New Jersey, as the beneficiary. Therefore, if the parties did not agree to a valid choice-of-law provision, New Jersey law applies. But, if the provision is valid, Maryland law applies. Under these circumstances, the Court must determine whether the parties made an enforceable agreement in order to apply the appropriate state's law.

Where a party challenges the validity of a choice-of-law provision on the grounds of misrepresentation, duress, undue influence, or mistake, the court applies the law of the forum state to determine whether the parties consented to that provision. Rest. 2d of Conflict of Laws § 187 cmt. b. The court is required to make findings of fact that are used to decide choice-of-law issues. *See In re Seyse*, 803 A.2d 694, 699 (N.J. Super. Ct. App. Div. 2002) (citing *Matter of Jacobs*, 717 A.2d 432, 437 (N.J. Super. Ct. Ch. Div. 1998) (The Court decided whether a person has the mental capacity to choose a new domicile.); Rest. of Conflict of Laws § 40 cmt. a ("It is a question of fact whether a person who is mentally deficient or of unsound mind is able to choose a home.").

1. Presumption of Undue Influence

Here, the forum is New Jersey, so the Court will apply New Jersey law to determine whether Jane Sogliuzzo's agreement to the choice-of-law provision, which provided that Maryland law governs the TOD Agreement, was procured by undue

influence. Again, in New Jersey, a presumption of undue influence arises when the party alleging undue influence establishes two elements: a confidential relationship and suspicious circumstances, however slight. *Haynes*, 432 A.2d at 897.

(a) Confidential Relationship

As to the first element, a confidential relationship exists where one party reposes trust in another, whether by reason of the entrusting party's weakness or because they are in a relationship where such trust naturally exists. *Haynes,* 432 A.2d at 897 (citing *In re Hopper's Estate*, 9 N.J. 280, 282 (1952)). "[T]he mere existence of family ties does not create . . . a confidential relationship." *Vezzetti v. Shields*, 92 A.2d 28, 32 (N.J. Super. Ct. App. Div. 1952) (citing *Eisenberg v. Finston*, 87 A.2d 448 (N.J. Super. Ct. App. Div. 1952)). One manner by which a confidential relationship can arise is where one party entrusts another with managing her financial affairs. *In re Estate of Penna*, 731 A.2d 95, 98 (N.J. Super. Ct. App. Div. 1999) (citing *Bronson v. Bronson*, 527 A.2d 943, 945 (N.J. Super. Ct. App. Div. 1987)). Another means by which a confidential relationship can arise is where one party suffers from an illness that causes her to repose her trust in another. *In re Estate of Stockdale*, Nos. A-0535-04T5, A-0769-04T5, 2006 WL 3770841, at *9 (N.J. Super. Ct. App. Div Dec. 26, 2006) *aff'd*, 953 A.2d 454 (N.J. 2008); *Bronson*, 527 A.2d at 945 (citing *In re Dodge*, 50 N.J. 192, 227-228 (1967)) (The Court held that a mother's creation of a joint account with her son was the result of undue influence because her dependence upon him to transport her for treatment of her illness created a confidential relationship.)

Here, John Sogliuzzo was Jane Sogliuzzo's son. Jane Adkins certifies that John Sogliuzzo was entrusted with managing their mother's finances. (Adkins Certif. ¶ 2(e),

(l)-(m).) In his Answer, John Sogliuzzo denies that he was so entrusted, but he did not verify his Answer.[5] (Answer ¶¶ 96, 99.) Jane Adkins also certifies that Jane Sogliuzzo suffered from various ailments: shortness of breath, inability to walk more than a short distance without relying on another person or a cane, poor vision, and a burning sensation in her eyes that caused her to keep them closed a lot of the time that she was awake. (Adkins Certif. ¶ 2(a)-(c), (g), (j), (k).) Jane Adkins has provided records of hospital admissions from Hoboken University Medical Center to support her claims. (Adkins Certif. Ex B.) In his Answer, John Sogliuzzo denies that his mother's health had been deteriorating since 2002, and he denies that her eyesight was progressively failing and that she had trouble breathing. (Answer ¶ 103.) Again, his responses are not verified. The hospital records indicate that John Sogliuzzo registered and discharged his mother from the hospital on numerous occasions—including discharging her from the hospital two weeks prior to her execution of the TOD Agreement. (Adkins Certif. Ex B.) Four months after signing the TOD Agreement, Jane Sogliuzzo died. (2d Am. Compl. ¶ 108.) For these reasons, we are satisfied that John Sogliuzzo and Jane Sogliuzzo shared the sort of confidential relationship described in *Bronson* and *In re Estate of Penna*.

(b) Suspicious Circumstances

As to the second element, suspicious circumstances need only be slight to create a presumption of undue influence. *Haynes*, 432 A.2d at 897. The Supreme Court of New Jersey stated that:

> An attorney-client relationship is inherently a confidential relationship, and because suspicious circumstances need only be slight, the existence of that relationship alone often results in . . . the shifting of the burden of proof . . . .

---

[5] John Sogliuzzo has not filed an Answer to the Second Amended Complaint. As such, we refer to the responses that he provided in the Answer to the Amended Complaint.

11

*Stockdale*, 953 A.2d at 470 (internal citations omitted). For example, in *In re Blake's Will*, the Court found undue influence where an attorney was his client's sole beneficiary even though they had been good friends for twenty-five years. 120 A.2d 745, 750, 752-753 (N.J. 1956). Indeed, the *Blake* Court did not specifically address suspicious circumstances but remarked instead upon how "[e]xperience is not without its lessons on the prudence of the policy" under "the civil law [that] a will written by a person in favor of himself was void" 120 A.2d at 753 (citing *Bennett v. Bennett*, 50 N.J. Eq. 439, 446 (N.J. Prerog. Ct. 1892)).

Here, the Plaintiffs allege that John Sogliuzzo served as counsel to Jane Sogliuzzo, that she relied on him as an attorney to protect her interests, and that he owed her a fiduciary obligation. (2d Am. Compl. ¶¶ 15, 102, 189, 333.) The Plaintiffs further allege that Jane Sogliuzzo gave John Sogliuzzo a General Power of Attorney. (2d Am. Compl. ¶ 107.) John Sogliuzzo has denied these allegations. (Answer ¶¶ 14, 101, 106, 188, 332). Because John Sogliuzzo may have been acting as his mother's attorney and was the sole beneficiary under the TOD Agreement, there is a suspicious circumstance.

Further, the Plaintiffs and Mr. Rodman agree that John Sogliuzzo was involved in the execution of the TOD Agreement; they only disagree about the extent of his involvement. Mr. Rodman certifies that John Sogliuzzo personally transported him and Jane Sogliuzzo to the restaurant meeting (Rodman Certif. ¶ 4; Rodman Dep. 68:14-24), but that John Sogliuzzo was not present during any substantive conversation between himself and Jane Sogliuzzo. (Rodman Certif. ¶ 4.) The Plaintiffs allege that John Sogliuzzo was responsible for arranging the meeting. (2d Am. Compl ¶ 185.) Mr. Rodman certifies that during a telephone conversation, Jane Sogliuzzo informed him that

she wished to convert her brokerage account to a transfer on death account. (Rodman Certif. ¶ 3.) John Sogliuzzo denies all allegations that he was involved in the execution of the TOD Agreement or states that he lacks sufficient information of the circumstances surrounding the execution of the Agreement. (Answer ¶¶ 181-185, 188-189). Again, he has not verified his Answer. While John Sogliuzzo was not responsible for drafting the TOD Agreement—as an attorney—he would have understood the legal effect of his mother naming him as the sole beneficiary in such an agreement.

New Jersey's Appellate Division has also found there to be suspicious circumstances in a case where a person who prepared a testamentary instrument had a relationship with a beneficiary named in the instrument "of the kind that ordinarily engender[s] a sense of loyalty, irrespective of the absence of a true attorney-client relationship." *In re Probate of Alleged Will of Landsman*, 725 A.2d 90, 97 (N.J. Super. Ct. App. Div. 1999). Because an investment advisor's relationship to an advisee has a "delicate fiduciary nature,"[6] it is the kind of relationship that engenders a sense of loyalty. Once a party establishes the existence of such a conflict of interest, that party need not also establish that the conflict was unresolved because that burden rests with the party whose loyalties are in conflict. *Cohen v. First Camden Nat. Bank & Trust Co.*, 237 A.2d 257, 262 (N.J. 1967) (The Court held that "the burden of proof is upon the trustee to show by convincing evidence that the [settlor and beneficiary] consented to the breach of trust with full appreciation of what was being done.") (citing *McAllister v. McAllister*, 184 A. 723, 728 (N.J. Ch. 1936), *aff'd* 190 A. 53 (N.J. 1936)). That is, the conflict of interest itself is the suspicious circumstance. *Haynes*, 432 A.2d at 900-901; *In re Sable*,

---

[6] *SEC v. Capital Gains*, 375 U.S. 180, 191 (1963) (citing 2 Loss, Securities Regulation (2d ed. 1961) at 1412).

13

No. A-3743-06T2, 2009 WL 321558, at *10 (N.J. Super. Ct. App. Div. Feb. 11, 2009) (The Court held that there was a conflict of interest to support a finding of undue influence where nothing in the record indicated that the testator's attorney ever disclosed to the client that he also represented the beneficiary, the testator's brother.)

It appears that Mr. Rodman managed accounts for Jane Sogliuzzo and John Sogliuzzo during the same period of time, including at the time that she executed the TOD Agreement. Mr. Rodman, therefore, owed a duty to John Sogliuzzo of the kind that ordinarily engenders a sense of loyalty. *See Landsman*, 725 A.2d at 97. John Sogliuzzo was the sole beneficiary of a testamentary instrument that Mr. Rodman presented to Jane Sogliuzzo for her signature. Thus, even though Mr. Rodman is not an attorney and has no attorney-client relationship with John Sogliuzzo, Mr. Rodman's conflict of interest constitutes a suspicious circumstance.

This conclusion is bolstered by other similarities between the circumstances in this case and those of *Landsman*. Like the attorney who prepared the will in that case, Mr. Rodman presumably received a benefit from his relationship with John Sogliuzzo— fees on John Sogliuzzo's own investment accounts. *Landsman*, 725 A.2d at 97. Also, as in *Landsman*, there were no disinterested witnesses to the signing of the instrument who can testify as to the circumstances of its execution. *Id*.

The signing of the TOD Agreement was also accompanied by other irregularities. It was executed in a restaurant, with only a handwritten note authorizing the transfer of Jane Sogliuzzo's funds. (2d Am. Compl. ¶ 183; Rodman Certif. Ex. B.) In his 34 years in the financial services industry, this was the only time that Mr. Rodman presented a

14

client with a TOD Agreement for execution outside of his office, let alone in a restaurant. (Rodman Dep. 102:23-103:10.)

The suspicious circumstances described, when combined with the confidential relationship between Jane Sogliuzzo and John Sogliuzzo, are sufficient to raise a presumption of undue influence in this case. *Haynes*, 432 A.2d at 897.

2. Rebutting the Presumption of Undue Influence

One who seeks to rebut a presumption of undue influence must show that the person to whom the presumption applies was following the dictates of her own mind and will, rather than being under the domination and influence of another. *Pascale v. Pascale*, 549 A.2d 782, 787 (N.J. 1988) (citing *In re Neuman's Estate*, 32 A.2d 826, 827 (N.J. 1943)). The absence of undue influence must be shown by a preponderance of the evidence. *In re Weeks' Estate*, 103 A.2d 43, 46 (N.J. Super. Ct. App. Div. 1954) (citing *In re Morrisey's Will*, 111 A. 26 (N.J. Prerog. Ct. 1920)). For public policy reasons, however, a presumption of undue influence must be rebutted with clear and convincing evidence where it arises from "a professional conflict of interest on the part of an attorney, coupled with confidential relationships between a testator and the beneficiary as well as the attorney." *Haynes,* 432 A.2d at 901 (citing *In re Davis*, 101 A.2d 521, 523 (N.J. 1953)).

In their moving and reply papers, the D.B. Defendants fail to address the issue of undue influence in its entirety. As a result, they have not attempted to rebut the presumption of undue influence. Nevertheless, Mr. Rodman's Certification contains observations of Jane Sogliuzzo during the meeting at which the TOD Agreement was executed that are relevant to whether she was following the dictates of her own will or

15

whether she was under the domination of another. Mr. Rodman certifies that Jane Sogliuzzo was "lucid, engaging, and appeared to fully understand the subject matter that was discussed." (Rodman Cert. ¶ 3.) He further certifies that he "took the time to fully explain to Ms. Sogliuzzo the terms and conditions of this type of account as well as the ramifications of signing these documents . . . . She reviewed each page, appeared to read and understand the entire document, and then signed the Agreement. She also reviewed the Authorization Letter before signing it." (Rodman Cert. ¶¶ 6-7.)

Mr. Rodman's account of his meeting with Jane Sogliuzzo is inconsistent not only with Jane Adkins' description of both her mother's lack of sophistication with finances and with her first-hand accounts of her mother's poor vision, but also with Jane Sogliuzzo's medical records. (Adkins Certif. generally; Adkins Certif. Ex. B.) According to Jane Adkins, Jane Sogliuzzo's knowledge of, and interest in, investing was so limited that she did not even open her bank statements. (Adkins Certif. ¶ 2(d), (l)-(m).) According to Jane Adkins, since 2007, her mother frequently kept her eyes closed because they burned. (Adkins Certif. ¶ 2(g).) She further certifies that, by 2006, her mother needed assistance to read the larger print menu at the very restaurant where the meeting with Mr. Rodman was held. (Adkins Certif. ¶ 2(c).) Jane Adkins also describes Jane Sogliuzzo's inability to read a large print crossword puzzle book in December of 2007. (Adkins Certif. ¶ 2(k)(4).) Jane Sogliuzzo's discharge instructions from the hospital, issued 16 days before the execution of the TOD Agreement, noted that she suffered from "blurred vision due to Spiriva." (Adkins Certif. Ex. B.) For these reasons, we are satisfied that Jane Sogliuzzo was physically unable to read the small print of the TOD Agreement. (Rodman Certif. Ex. A.) That Mr. Rodman remembers that Jane

16

Sogliuzzo "reviewed each page, [and] appeared to read and understand the entire document" demonstrates that he may not recall the circumstances surrounding the execution of the TOD Agreement. It may also be that Mr. Rodman remembers correctly but that Jane Sogliuzzo gave the appearance of reading and understanding the TOD Agreement even though she did not. Even on the standard of the preponderance of the evidence, the D.B. Defendants do not meet their burden to establish that there was no undue influence in the execution of the TOD Agreement. The presumption that John Sogliuzzo unduly influenced Jane Sogliuzzo therefore stands.

Jane Sogliuzzo may not have genuinely agreed to the choice-of-law provision, which designates that Maryland law governs the TOD Agreement, because she was subjected to undue influence. Thus, the law of the state with the most significant relationship to the transaction applies. Rest. 2d Conflict of Laws § 188. As concluded above, New Jersey law governs whether there was a contract between Jane Sogliuzzo and D.B.S.I.

**C. Arbitration**

The Court, having found New Jersey law governs the TOD Agreement, must now address whether there is a genuine issue of material fact as to whether there is a valid arbitration provision. Again, under the Federal Arbitration Act and *Par-Knit Mills*, this Court cannot decide whether or not there was an agreement to arbitrate unless there are no genuine issues of material fact. 9 U.S.C. § 4; 636 F.2d at 54.

As we have concluded that there was undue influence under New Jersey law in answering the choice-of-law question, it would be inconsistent to conclude that the Plaintiffs presented no genuine issues of material fact in challenging the arbitration

agreement. Indeed, Jane Adkins' Certification creates a genuine issue of material fact with respect to whether there was undue influence. Some of these issues include the nature of the relationship between Jane Sogliuzzo, John Sogliuzzo, and Mr. Rodman and Jane Sogliuzzo's ability to understand the TOD Agreement.

As *Par-Knit Mills* limits the power of the court to determine whether or not there was a valid agreement to arbitrate to when there are no genuine issues of material fact, this also precludes the Court from finding that the arbitration provision is invalid. 636 F.2d at 54. While this Court has concluded that Mr. Rodman may not recall circumstances surrounding the execution of the TOD Agreement, his Certification still presents a genuine issue of material fact with respect to whether there was undue influence.

Thus, the Court is compelled by 9 U.S.C. § 4 to order a trial on the issue of whether there was a valid arbitration agreement.

In support of the Motion, the D.B. Defendants do not make any arguments with respect to choice-of-law or undue influence. Rather, they argue that "if a party challenges the legitimacy or validity of the contract as a whole, and *not just* the arbitration provision itself, the issue must be addressed in arbitration." (Reply 4) (emphasis added). That is, they argue to no avail that pursuant to *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), this Court must order arbitration because the defense of undue influence applies not only to the arbitration clause but to the TOD Agreement generally. However, in *Prima Paint*, the Supreme Court held that courts must order arbitration where a defense would be valid against the contract as a whole but where that defense is *ineffective* against the arbitration provision. 388 U.S. at

18

403-404.  In discussing *Prima Paint* in *Buckeye Check Cashing, Inc.*, the Supreme Court noted that *Prima Paint* did not address challenges as to "whether any agreement between the alleged obligor and obligee was ever concluded."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006).

Here, the issue is whether any agreement to arbitrate was ever concluded between the alleged obligor, Jane Sogliuzzo, and the alleged obligee, D.B.S.I.  We are not concerned with whether undue influence applies to the TOD Agreement generally.  Rather, we have already determined that undue influence prevented Jane Sogliuzzo from agreeing to the arbitration provision.  As such, compelling arbitration of the Plaintiffs' claims against the D.B. Defendants is not appropriate.

### D.  Deutsche Bank as an Improper Party

The D.B. Defendants move to dismiss Defendant Deutsche Bank as there is simply no entity in existence bearing the name "Deutsche Bank."  The Plaintiffs did not oppose this motion.  As such, Defendant Deutsche Bank is dismissed because it is a nonexistent party.

### IV.  CONCLUSION

For the reasons stated above, the Motion to Dismiss the Complaint Against the D.B. Defendants and to Compel Arbitration of the Claims Asserted Against the D.B. Defendants is denied.  Further, the Motion to Dismiss the Complaint Against Defendant Deutsche Bank is granted.  An Order follows.

S/Susan D. Wigenton, U.S.D.J.

Orig:  Clerk
Cc:    Madeline Cox Arleo, U.S.M.J.
       Parties