## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JANE E. ADKINS,**<br><br>           **Plaintiff,**<br><br>**vs.**<br><br>**JOHN B. SOGLIUZZO, ESQ,<br>DEUTSCHE BANK ALEX BROWN, H.<br>THOMPSON RODMAN, L. GAYE<br>TORRANCE, TD BANK, N.A., and<br>HAVEN SAVINGS BANK,**<br>           **Defendants.** | **Civil Action No.:**<br>**2:09-cv-01123(SDW)**<br><br><br>**THIRD AMENDED COMPLAINT** |

Plaintiff, Jane E. Adkins, through her counsel by way of Third Amended Complaint against Defendants, John B. Sogliuzzo, Esq., Deutsche Bank Alex Brown ("Alex Brown"), H. Thompson Rodman, L. Gaye Torrance, TD Bank, N.A., and Haven Savings Bank states as follows:

### PARTIES

1.     Plaintiff, Jane E. Adkins ("Jane Adkins or Plaintiff") is a resident of the Commonwealth of Virginia with an address at 9502 Lynnhall Place, Alexandria, Virginia 22309.

2.     Paragraph 2 intentionally omitted.

3.      John B. Sogliuzzo ("John Sogliuzzo") is a resident of the State of New Jersey with an address at 28 Great Oak Drive, Short Hills, New Jersey 07078. John B. Sogliuzzo is a N.J.-licensed attorney and operates a law practice at 50 Northfield Avenue, Suite 200, West Orange N.J. 07052.

4.      L. Gaye Torrance ("Gaye Torrance") is the wife of John B. Sogliuzzo and is a resident of the State of New Jersey with an address at 28 Great Oak Drive, Short Hills, New Jersey 07078.

5.      H. Thompson Rodman ("Rodman") is an individual who is a resident of the State of New York with a residence of 4 Dellwood Circle, Bronxville, New York 10708.

6.      Alex Brown is a corporation founded under the laws of the State of Delaware with an address at 60 Wall Street, 36th Floor, New York, New York 10005.  Upon information and belief, Alex Brown is licensed to do business in the States of New York and New Jersey.

7.      Paragraph 7 intentionally omitted.

8.      TD Bank, N.A., is a Nationally Chartered Banking Association with its principal place of business in the State of New Jersey ("TD Bank").

9.      Haven Saving Bank is a New Jersey Savings bank with its headquarters at 621 Washington Street, Hoboken, New Jersey. 07030.

## JURISDICTION AND VENUE

10.     There is federal jurisdiction in this case as there is complete diversity between the parties.  The Plaintiff is a citizens of Virginia and none of the Defendants are incorporated here or reside in Virginia and the amount in controversy exceeds the sum specified by 28 U.S.C. § 1332.

11.     This case is not subject to the Probate Exception because the acts complained of

herein happened prior to the deaths of Mary T. Grimley and Jane P. Sogliuzzo and/or involve legal issues and additional parties on which a Probate Court cannot rule.

12.    The venue here is proper in that the District of New Jersey is the venue in which the acts complained of were committed and the principal Defendants reside in New Jersey.

## OVERVIEW

13.    John Sogliuzzo is the brother of Plaintiff and is an attorney at law of the State of New Jersey. John Sogliuzzo is the former Executor of the Estate of Mary T. Grimley and the former Executor of the Estate of Jane P. Sogliuzzo.

14.    Beginning at least as early as January 1999, upon the death of his father, John Sogliuzzo started presiding over his mother, Jane P. Sogliuzzo's financial affairs.

15.    From 1999 through her death on February 29, 2008, using his confidential relationship as an attorney, trusted financial advisor, and son, John Sogliuzzo funneled approximately $400,000.00 in intervivos transfers from his mother to himself, his law practice and for the benefit of his family.

16.    Four (4) months before her death, John Sogliuzzo arranged for his mother (92 at the time) to designate her brokerage account as a transfer on death ("TOD") account payable only to him. The account was worth approximately $273,000.00 at the time of her death.

17.    In 2002, Jane P. Sogliuzzo's elderly cousin, Mary T. Grimley, came to live with Jane P. Sogliuzzo, because Mary Grimley's health was failing, and she could no longer live alone.

18.    John Sogliuzzo established a confidential relationship with Mary Grimley by doing her banking. During her lifetime he embezzled, converted and transferred over

$500,000.00 to himself and his wife.

19.     After Mary's death, John Sogliuzzo assumed the role of executor of Mary T. Grimley's Estate.  In that role, he wrote checks to himself, his wife and his law firm totaling over $158,000.00 while distributing just $28,500.00 to his sister and just $5,000.00 to his mother, Jane P. Sogliuzzo, all three equal beneficiaries under Mary's will.

20.     This action is brought in tort against John Sogliuzzo for his actions of malpractice, breach of fiduciary duty, conversion, theft, embezzlement and otherwise misappropriating over $1.2 million in assets from Jane P. Sogliuzzo and Mary Grimley; against Gaye Torrance and Tom Rodman for their roles in assisting John in these endeavors; against Alex Brown, Havens Savings Bank and TD Bank for their negligence and breach of fiduciary responsibilities in failing to recognize and protect their clients from the actions of John Sogliuzzo.

## FACTS COMMON TO ALL COUNTS

### A. Mary T. Grimley - Background

21.     Mary T. Grimley ("Mary") was born on December 26, 1914.

22.     Mary grew up in Hoboken, New Jersey in "a cold water flat" at 827 Garden Street, 2nd Floor, Hoboken, New Jersey with her parents and older brothers, Matthew and James, and baby brother, Joseph.

23.     Mary never married.  As the only daughter in an Irish family, she felt a great devotion to family.  She remained in the same apartment that she was raised and cared for her parents as they became older, and then later her two bachelor brothers, James and Joseph, until each of their deaths.

24.     Mary's brother, Matthew, married and was the only Grimley to leave their

apartment.  Matthew predeceased Mary. Matthew and his wife, Helen, had one daughter, Mary Jane, who predeceased Mary T. Grimley.

25.     Mary's family lived through the Great Depression.  Like most in that generation, they lived very frugally, skimping and saving and putting away whatever monies they could both in CDs, and after the war in United States Savings Bonds.

26.     Also like many who lived through the Great Depression, Mary did not completely trust banks.  Throughout her life, Mary kept her purse within "eyeshot."

27.     The Grimley's did not believe in doctors.  Upon information and belief, both James and Joseph died from illnesses that could have been treated had they sought medical attention.

28.     Mary inherited some monies from her parents and later on from her brothers, James and Joseph.

29.     Mary had no sisters of her own and was very close to her two first cousins, Jane P. Sogliuzzo and Kathleen Grimes.  Jane Sogliuzzo and Kathleen Grimes' mother and Mary's mother were sisters.

30.     Jane P. Sogliuzzo and Kathleen Grimes lived with their family in Hoboken just a few short blocks away from Mary.  Jane Sogliuzzo was just two (2) months younger than Mary and because of their proximity in age, their relationship was very close.

31.     Mary worked in New York City all of her adult life and many years with Hartford Insurance.  Mary was also a devoted churchgoer.

32.     Mary valued her independence.  However, because she had no young family of her own, was very close to Jane Sogliuzzo's family which consisted of husband Walter and three children, W. Gerard Sogliuzzo ("Gerry"), Jane Elizabeth ("Plaintiff"), and baby brother, John

Brian Sogliuzzo ("John Sogliuzzo").

33.     Jane Adkins was Mary's god daughter and to Mary that was a very special and sacred relationship.  Mary never made it a secret that Jane Adkins was her favorite cousin.

34.     Mary's relationship with Gerry was also good.  When Gerry became ordained as a priest, Mary was tremendously proud and enjoyed addressing him as "Father Gerry" from that moment on.

35.     Mary's relationship with John Sogliuzzo was not close.  Unlike Father Gerry and her god daughter Jane Adkins, there was no special bond between them.

36.     As the years passed, Mary first lost her parents, then her brothers, then her cousin, Kathleen.  As Mary lost her own family, she remained close to Jane P. Sogliuzzo and Walter. Other than her friend, Millie Braun, and the church, the Sogliuzzo's remained Mary's closest family.

37.     Mary's god daughter, Jane Adkins married Charles Adkins and moved out of state.

38.     Although Jane Adkins was out of state, their relationship never waned.  Mary made several overnight trips to the Adkins' homes.  The Adkins and their children were frequent visitors to Mary Grimley and Jane and Walter Sogliuzzo.

39.     Kevin Adkins, Jane and Charlie Adkins' son moved into his grandparents home located at 1228 Bloomfield Street (the "Hoboken House") in August 1998 and remained there until March of 2001 when he got married and purchased his own condo two blocks away from his grandparents.

40.     Diana, Kevin's fiancé, who he had dated since high school, had moved to Hoboken in June 1998 and was initially staying in the Hoboken House's third floor apartment.

6

In August 1998 she moved three (3) doors down until her marriage to Kevin.  At that time, they bought and lived in a condominium two blocks away.

41.     While in Hoboken, Kevin and/or Diana would often look in on Mary and Jane P. Sogliuzzo to visit with them and make sure they were both okay.

42.     Kevin and Diana often took Mary and/or Jane P. Sogliuzzo grocery shopping and each shopped on their own.

43.     Although she was increasingly becoming less mobile, Mary continued to hold on to her independence and walked to mass daily until September 2002.

44.     From 1998 to 2002, Kevin would occasionally find Mary on the floor in her apartment as she had fallen and was not able to get up.

45.     Once, while slowly exiting a cab the cab pulled away and Mary ended up lying injured in the street.  Another time, she was brushed by a car, fell to the ground and refused medical treatment.  On other occasions, she fell in the street and required strangers to help her to her feet.

46.     It was Kevin who found Mary on her floor in her apartment in the Spring of 2002. Mary had fallen and remained on the floor for two days.  Kevin immediately called an ambulance and John Sogliuzzo.  Mary was taken by ambulance to the hospital where she was treated for dehydration and released.  Kevin cleaned the floor of her apartment which Mary had soiled while she lay there.

47.     In appreciation for the personal care, assistance and companionship that Kevin provided to Mary while living in Hoboken, she acknowledged her appreciation by setting up an "in trust" savings account for Kevin in the amount of $5,000.00.  Kevin was the only child of Jane or John to be given this bequest.

48.     Although Mary's physical condition continued to decline she was reluctant to go to any doctor. She never had a regular physician before her fall in Spring 2002 at which time she began to use Jane P. Sogliuzzo's physician.

49.     By the Summer of 2002, Mary's physical and mental health had deteriorated to the point at which she could no longer live alone and she finally and reluctantly acknowledged it. The family finally convinced Mary that she should move in with Jane P. Sogliuzzo.

### B.  Mary Moves in With Jane Sogliuzzo

50.     In September 2002, Mary moved into the 3rd floor apartment of the Hoboken House.

51.     Jane P. Sogliuzzo had a daily caretaker, Verona, who worked Monday through Friday from 9:00 a.m. until 4:00 p.m. who could also look in on Mary.

52.     After Mary had moved in with Jane P. Sogliuzzo, Jane Adkins and John Sogliuzzo cleaned out Mary's apartment.   While performing the cleaning, Jane Adkins discovered six round cookie tins in Mary's closets.  When she opened the first cookie tin, Jane discovered that the tin contained envelopes stuffed with cash.   It appeared that there was $16,000.00 to $20,000.00 in that first tin.

53.     Jane Adkins immediately called John Sogliuzzo who came over.  Together, Jane Adkins and John Sogliuzzo opened every cookie tin and counted and recounted the monies, placing an index card in the tin with the amount of monies in that tin.  The denominations of the bills were also recorded.

54.     When the monies were finally counted from the tins, the  cash was between $65,000.00 and $80,000.00. John Sogliuzzo kept the only copy of the reconciliation.

55.     Jane Adkins and John Sogliuzzo then went to see Mary with the cash and

suggested that John Sogliuzzo deposit the monies into Mary's bank account.

56.    Mary agreed and John Sogliuzzo left with the cash.

57.    That weekend, Charles Adkins and Gaye Torrance joined Jane Adkins and John Sogliuzzo in cleaning out Mary's apartment. Throughout the weekend, they continued to find large quantities of cash hidden throughout the apartment in drawers, closets and in clothes.

58.    All monies found were given to John Sogliuzzo for deposit into Mary's accounts.

59.    Even after that weekend, as Jane Adkins continued to dispose of items accumulated for seventy-six (76) years, Jane Adkins found another $1,200.00 in cash in a bag under the dining room table. Jane Adkins asked Mary where to put it and Mary told her in the closet in the kitchen in her 3rd floor apartment at the Hoboken House. Jane Adkins did as instructed.

60.    Mary's physical and mental condition continued to deteriorate. To contribute to her feelings of independence, Kevin Adkins and his wife Diana continued to take Mary to church on Sunday and on their frequent grocery shopping trips where she shopped alone. At the end of one such grocery shopping trip in late 2003, Mary had nothing in her grocery cart and was disoriented.

61.    In or about late 2003 or early 2004, Mary started showing additional signs of being mentally confused. She would dress for church at odd times on all days of the week, believing it was Sunday. She would also dress up and get ready for imaginary lunches in Manhattan with friends of hers that were already deceased.

62.    From the time Mary moved into the Hoboken house, she and Jane had a nightly ritual. Mary would come down after dinner, and she and her cousin would watch Jeopardy and Wheel of Fortune together every night.

63.     By 2004, Mary would come down the stairs on her bottom as she could no longer brave the stairs on her feet for fear of falling.

64.     In February 2004 unbeknownst to Plaintiffs, John Sogliuzzo prepared a Power of Attorney for Mary.  Upon information and belief, there were no witnesses to Mary's signing of the Power of Attorney.  Although his mother and her caretaker were downstairs, they did not witness the Power of Attorney.

65.     Upon information and belief, instead, John Sogliuzzo took it back to his office, where he had his assistant sign as a witness, even though she was not present.  Upon information and belief, this was a standard practice for John Sogliuzzo.

66.     Mary had never wanted anyone to know her financial business.  She had been careful all her life not to let anyone know about her finances.  Even with her failing faculties and physical ailments, Mary remained a proud and independent woman who resisted disclosing her financial matters to anyone including members of her family.  Mary still always kept her purse close at hand keeping it within her sight.

67.     Once he had Mary's Power of Attorney, John set up another account for Mary at a brand new bank, Hudson Bank.  That is the account that John used.

68.     Upon information and belief, John Sogliuzzo stopped by the Hoboken House once a week usually on Friday afternoons to do Jane P. Sogliuzzo (his mother's) and Mary's banking. He had been doing his mother's banking since at least 1999 when his father died and Mary's banking since September 2002 without a Power of Attorney.

69.     Upon his arrival, John Sogliuzzo would write out checks for Jane P. Sogliuzzo's bills and then go upstairs to Mary's apartment for the same purpose, to write out her checks.

70.     Although Jane Adkins was present on several of these occasions when John

10

Sogliuzzo visited Jane P. Sogliuzzo and Mary to write out checks, Jane Adkins never accompanied her brother upstairs to see him write checks for Mary.

71.     Mary's physical and mental conditions continued to deteriorate from 2004 until her death in 2006.  During her last year of life, her dementia was so prevalent that she did not recognize very many people and this very modest woman would continually disrobe.  She also required a hospital bed to keep her from falling out of bed.  During the last few weeks of her life, Mary was under the care of Hospice.

72.     Mary died on October 16, 2006, at the age of ninety-one (91).

## C.  John's Administration of the Estate of Mary T. Grimley

73.     The Last Will & Testament of Mary T. Grimley ("Mary's Will") executed June 27, 1996 was admitted to probate in October, 2006.

74.     John Sogliuzzo and his mother, Jane P. Sogliuzzo, were named as co-executors.

75.     Upon information and belief, John B. Sogliuzzo convinced his mother, then ninety (90) years old to step down as co-executor of Mary's Will.  John Sogliuzzo was granted letters testamentary on October 30, 2006.

76.     The terms of Mary's Will provides that she leaves one-seventh (1/7) of her estate to each of the five (5) members of the Sogliuzzo family, Jane P. Sogliuzzo, Walter, Father Gerry, Jane Adkins and John Sogliuzzo and one-seventh (1/7) each to Our Lady of Grace Catholic Church in Hoboken and to Millie Braun, a long time friend.

77.     Since Walter and Gerry had predeceased Mary, the Will provided that their shares were to be split equally between the remaining members of the Sogliuzzo family.

78.     Per Mary's Will, the distribution of her Estate was to be:

| | | | |
|---|---|---|---|
| John B. Sogliuzzo | 1/3 (5/7) | = | 23.8% |
| Jane P. Sogliuzzo | 1/3 (5/7) | = | 23.8% |
| Jane E. Adkins | 1/3 (5/7) | = | 23.8% |
| Melitta Brown | 1/7 | = | 14.3% |
| Our Lady of GraceCatholic Church | 1/7 | = | 14.3% |

79.     In January 2008, John Sogliuzzo handed a single check, dated December 19, 2007, to Jane Adkins in the amount of $28,750.00, telling her that this amount was her entire share of Mary's Estate, and adding that she had done very well from family inheritances in 2007.

80.     Although the distribution check to Jane E. Adkins was dated December 19, 2007 as were the checks to the other beneficiaries, John B. Sogliuzzo never sent the check to her. Instead, he waited to give the check to her in person on her next trip to Hoboken, but only after she had signed a Release and Refunding Bond in his presence.

81.     On or about January 8, 2008, John Sogliuzzo made a special trip to Hoboken. He met Jane Adkins at church, went with her for coffee, returned with her to 1228 Bloomfield Street, but did not go in, even though his mother was inside.

82.     Just prior to saying goodbye, he asked her to wait outside in front of the house while he went to his car to get the distribution check that he said he had almost forgotten about.

83.     At that point he handed Jane Adkins the letter and the Release and Refunding Bond and directed her to sign it in order for her to receive the check. He did not fully explain what she was signing or give her an opportunity to consult with anyone. There was no one else present, but John Sogliuzzo said he would have his assistant, Paula, notarize it at a later date back in his office. Upon his direction, Jane Adkins signed the Release and Refunding Bond on the hood of the car. John then gave her the check and left without going inside to see their mother.

84.     John Sogliuzzo provided Jane Adkins with no documents, no accounting and no

information on the Estate of Mary Grimley although he was asked to do so on several occasions.

85.    To date, he has not filed a final accounting on the Estate of Mary Grimley.

### D. The Sogliuzzo Family - Background

86.    Walter and Jane Sogliuzzo moved out of their two (2) bedroom Hoboken apartment and purchased the Hoboken House in 1968 when John Sogliuzzo was 12 years old.

87.    John Sogliuzzo graduated from Fairfield College in 1978; received a law degree at Seton Hall University; clerked for a judge; worked as a prosecutor in Hudson County; married Gaye Torrance, a Pittsburgh socialite; joined a small firm; and then eventually opened his own practice.

88.    Walter and Jane Sogliuzzo loaned monies to John Sogliuzzo to buy his own home in Hoboken.  In September 1987, John Sogliuzzo and Gaye Torrance sold their house in Hoboken and purchased a house in Short Hills.

89.    Once John Sogliuzzo and his family moved to Short Hills, John Sogliuzzo gradually distanced himself and his family from his parents and from his brother, Gerry.  Except for Christmas dinner at his home, John rarely had his mother, his father, and Gerry visit him in his Short Hills home.

90.    His father, Walter would often complain that John Sogliuzzo and/or Gaye Torrance would not bring the grandchildren to see them, about the slow repayment of John's original house purchase loan, and with John Sogliuzzo's "high and mighty" lifestyle in Short Hills.

91.    Over time, John Sogliuzzo's relationship with his father deteriorated.  In one dispute at the dinner table, in an argument with his father, John Sogliuzzo jumped up, said "one day I will be able to buy and sell you", and walked out.

92.     Because of John Sogliuzzo's distancing himself and his family from his parents and his modest, middle-class, Catholic upbringing, John Sogliuzzo and his family did not receive any special financial consideration from his parents, at least not while Walter was alive.  The following table of annual birthday checks demonstrates that fact.

**Walter & Jane Sogliuzzo**
Prior Years Birthday Checks to Children & Grandchildren

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| Son: | | | |
| **Rev. W. Gerry Sogliuzzo** | $100 | $500 | $100 |
| | | | |
| Daughter: | | | |
| **Jane E. Adkins** | $50 | $50 | $50 |
| Charlie, *Husband* | $50 | $50 | $50 |
| Chris, *Son* | $50 | $50 | $50 |
| Kevin, *Son* | $40 | 100* | $50 |
| Tim, *Son* | $40 | $50 | $50 |
| | | | |
| Son: | | | |
| **John B. Sogliuzzo** | $40 | $45 | $50 |
| Gaye Torrance, *Wife* | NA | NA | NA |
| Caraline, *Daughter* | NA | NA | NA |
| Jay, *Son* | NA | NA | NA |

*NA:  No Record of Birthday Checks*

*\* Kevin's 21st Birthday*

## E.  John Sogliuzzo Takes Over Jane Sogliuzzo's Finances

93.     Walter Sogliuzzo died in January 1999.

94.     Before his death, Walter took care of all of Jane P. Sogliuzzo's finances, although Jane P. Sogliuzzo wrote most of the checks for the family.

95.     Neither Jane P. Sogliuzzo, nor her husband, Walter, were exceptionally generous

14

people by nature. During Walter's lifetime, neither Jane P. Sogliuzzo nor Walter gave large or extravagant gifts, cash or otherwise, to any of their children or their grandchildren. The only exception was the continued financial assistance to their son, Gerry, a Catholic priest with very limited income.

96. They did, however, loan monies from time to time to their children which Jane P. Sogliuzzo and Walter insisted be repaid.

97. Beginning with his father's death in January 1999, John Sogliuzzo, without a Power of Attorney, assumed control of Jane P. Sogliuzzo's finances. Except for occasional small checks which Jane P. Sogliuzzo wrote on her own; most of her checks were prepared by John Sogliuzzo including all those for significant sums.

98. John set up a new checking account for his mother and closed his parents' joint account.

99. Upon information and belief, John Sogliuzzo signed these checks in his mother's name or handed the checks to Jane P. Sogliuzzo for her signature.

100. In April/May 1999, John Sogliuzzo closed several Jane P. Sogliuzzo's bank accounts and set up an Alex Brown Investment Account (the "Alex Brown Account") in her name. The Alex Brown Account was set up with John Sogliuzzo's own Alex Brown broker, Tom Rodman. John was designated to manage the account and he alone did so.

101. John Sogliuzzo funded this account via transfers from Jane P. Sogliuzzo's CDs and savings accounts. Although Jane P. Sogliuzzo was a bright woman she had no experience managing her finances or investments and relied on John Sogliuzzo for these functions.

102. Further, because he is a lawyer and her son, Jane P. Sogliuzzo relied on John Sogliuzzo to protect her interests and give her proper advice. She trusted him implicitly.

15

103.    In about 2002 at the age of eighty-seven (87), Jane P. Sogliuzzo suffered a broken shoulder.  She required a housekeeper/caregiver during the day to assist her in doing housework, getting around and performing day to day household functions including dressing, bathing and cooking.

104.    From late 2002, Jane P. Sogliuzzo's health continued to deteriorate.  By 2005, her eyesight was progressively failing, she had trouble breathing and on some days she was mentally absent, meaning she just didn't care.

105.    In or about 2005, Jane P. Sogliuzzo's physical condition had deteriorated to the point that a full time caregiver "Anna" was hired to take care of Jane P. Sogliuzzo and Mary T. Grimley.

106.    John   Sogliuzzo,   being   the   closest   in   geographical   proximity   to Jane P. Sogliuzzo, arranged for her physical care.   Approximately once a week on Friday afternoons, John Sogliuzzo stopped by the Hoboken House to perform bill paying and banking for Jane P. Sogliuzzo and Mary.

107.    On November 20, 2006, unknown to the Plaintiffs, John Sogliuzzo had Jane P. Sogliuzzo execute a General Power of Attorney for his benefit.  The only person to witness the signatures was Paula Marie Iannia, John's legal assistant.  Upon information and belief, the document was signed by Ms. Iannia at John's office in Newark while Jane P. Sogliuzzo never left Hoboken.

108.    Jane P. Sogliuzzo died on February 29, 2008 at the age of ninety-three (93).

### F. John Sogliuzzo's Dealings with his Sister

109.   Shortly after his mother's funeral on March 4, 2008, John Sogliuzzo met with his sister alone and informed her for the first time that his mother had made him the sole beneficiary of her Alex Brown account.

110.   At that same meeting, he further informed his sister that other than the Hoboken House there was little left in the Estate.  He suggested that they form a corporation to allow him to rent out the Hoboken House until he could raise the money to buy Jane Adkins' share.

111.   Jane Adkins was shocked that her mother's bank accounts had been fully depleted and hurt that her mother had never told her of her intent to leave John Sogliuzzo essentially what he described as the entirety of her remaining liquid assets.  Jane Adkins was also puzzled as to why John Sogliuzzo did not have the money to buy her half of the house or could not take out a mortgage on his Short Hills home or a loan to do so.

112.   John Sogliuzzo suggested he run this proposal to form a corporation past Charlie. Jane Adkins agreed.

113.   The two went directly to the Hoboken House and met with Charlie.  When the proposal on setting up a corporation to rent out the house was made to Charlie, John Sogliuzzo did not mention his claims to the Alex Brown Account.

114.   Later, when Jane Adkins informed Charlie of this unexpected claim of John Sogliuzzo to the entirety of the Alex Brown Account, Charlie was dumbfounded and could not believe that Jane P. Sogliuzzo would have agreed to that.

115.   Jane Adkins was equally puzzled and decided to call John Sogliuzzo that same evening (March 4, 2008) to confirm that she had heard him correctly – that the Alex Brown Account was totally for him.

116.     John Sogliuzzo was furious that Jane Adkins had called him while he was attending his son's hockey game.   When asked by Jane about the TOD agreement, John Sogliuzzo said that it was done about a year and a half before and that it was what their mother wanted.

117.     When Jane Adkins challenged him on this point and could not accept these circumstances as true, John Sogliuzzo shouted, "go ahead and sue me for undue influence."

118.     Jane Adkins told John Sogliuzzo that she was very upset, that she and her husband were leaving Hoboken that night, and that she would not agree to the TOD arrangement.

119.     Before leaving, Jane and Charlie Adkins checked Jane P. Sogliuzzo's kitchen and closets and noted that there were numerous files and redwell folders containing her mother's financial, banking and invoice records.

120.     The very next day, March 5, 2008, John Sogliuzzo and Gaye Torrance came to the Hoboken House to retrieve documents.   Jane Adkins son, Timothy, was still staying at the house.  John Sogliuzzo spoke with Tim, asking him at length about his experiences and plans.

121.     Meanwhile, Gaye Torrance was free to move about the house.

122.     When Tim noted that they were leaving with a number of folders and records, John Sogliuzzo told him that they were there to get data necessary for tax returns.

123.     Shortly thereafter, Jane Adkins confronted John Sogliuzzo and questioned him again regarding their mother's Alex Brown Account.  John Sogliuzzo assured her that converting that account to a Transfer on Death ("TOD") account was strictly their mother's idea.  This time he told Jane Adkins that it had been set up as a TOD one (1) year before her death and not a year and a half as he had previously maintained.

124.     On March 13, 2008, by e-mail, Jane Adkins asked John Sogliuzzo not to probate

Jane P. Sogliuzzo's Will and not assume the role of Executor until she had an opportunity to meet with him and get some details and questions answered about the TOD account.

125.     Despite her questions and concerns on the Estate of Jane P. Sogliuzzo, John Sogliuzzo ignored his sister's requests and probated the Will of Jane P. Sogliuzzo on March 13, 2008.

126.     Later John Sogliuzzo claimed that he did not read the e-mail until after his return from Hudson County Surrogate Court where he had probated the will.

127.     Jane and Charlie Adkins returned to the Hoboken House for the Easter holiday, March 20-24, 2008.   At that time, Charlie reviewed many of Jane P. Sogliuzzo's financial records remaining in the Hoboken House.   The records showed a trail of financial irregularities and self dealings that John Sogliuzzo had perpetrated with respect to his mother's accounts since at least August 2000.   Charlie also searched for and reviewed the financial records of Mary that remained in her 3rd floor apartment.   Charlie took notes on what he found.

128.     Shortly thereafter, Jane Adkins officially notified John Sogliuzzo that she was revoking the Release and Refunding Bond in Mary's Estate and informed him that she and Charlie had seen evidence of his transgressions.

129.     In a further attempt to resolve the issues without the intervention of third parties, Jane Adkins again met with John Sogliuzzo on April 4, 2008 at Union Station in Washington, D.C.  She went alone at John's insistence.

130.     There, when questioned, John Sogliuzzo was evasive, defensive and continued to maintain that he had done nothing wrong, that it was entirely his mother's idea to leave the TOD account to him.   He accused Jane Adkins of only being interested in the money and that she would get an accounting of Mary's Estate only when it was finalized.   He said he would not

provide documents in a "piecemeal manner." He also advised her that if he had to hire an accountant to do an accounting, it would cost even more money.

131.   Shortly thereafter, John Sogliuzzo directed Jane Adkins to his counsel, Robert Gigl, Esq. for all communications with respect to these matters.

132.   Upon information and belief, sometime after Jane and Charlie's Easter visit, John and/or Gaye returned to the Hoboken Home and removed all of Jane Sogliuzzo's financial documents, files, and redwell folders, as well as Mary's checking account notebooks and possibly other financial documents and records.

133.   Eventually, after a writing campaign in which he professed no wrongdoing and accused his sister about "being only about the money" and when faced with the evidence, John Sogliuzzo produced documents that revealed that he had violated his mother's trust, his cousin Mary's trust, his sister's trust and had transferred over one million dollars ($1,000,000.00) from Mary Grimley and Jane P. Sogliuzzo both in intervivos and post death transfers to himself and for the benefit of his family.

**G.  Intervivos Transfers from Jane P. Sogliuzzo's Monies**

134.   Since at least September 2000, if not earlier (statements not yet available) John Sogliuzzo wrote (or had Jane P. Sogliuzzo sign and/or write) checks to himself. By the date of Jane P. Sogliuzzo's death, John Sogliuzzo had written checks to himself or for his family's benefit for a sum in excess of $58,000.00. Approximately ten (10) checks were written, with individual values between $1,000.00 and $15,000.00.

135.   Also during the period of January 2001 to February 2008, John Sogliuzzo wrote forty-five (45) checks to "Cash" in excess of $1,000.00 each. The check size ranged from $1,000.00 to $3,500.00 for a total of $57,175.00.

136.    Upon information and belief, John Sogliuzzo signed (forged) his mother's name on many of the checks to himself and on most of the large checks to "Cash", even before he received Power of Attorney in November 2006.

137.    Upon information and belief, in 2004 and 2005, it appears that Jane P. Sogliuzzo was personally signing most of the weekly checks for "Cash". At this time, the cash checks were generally in the $300.00 - $500.00 range, with some checks at $875.00.

138.    During the period of August 2000 to January 2002, John Sogliuzzo wrote seventeen (17) checks to John B. Sogliuzzo, Esq. or the Law Offices of John B. Sogliuzzo for an aggregate amount of $99,800.00. These checks were deposited into John's Attorney Business Account.

139.    In 2007, the year preceding Jane P. Sogliuzzo's death, when she was ninety-two (92), John Sogliuzzo withdrew essentially the entire balances in two of her three remaining savings accounts, leaving balances of only $1,038.00 and $528.00 respectively in these two (2) accounts.

140.    From Jane P. Sogliuzzo's Hudson United Bank ("HUB") Account No. *****16301, John made twenty-two (22) withdrawals totaling $39,350.00. As much as $23,850.00 of that was never deposited into a Jane P. Sogliuzzo account.

141.    From Jane P. Sogliuzzo's HUB Account No. *****00948, John made twenty-nine (29) withdrawals totaling $102,300.00. $47,050.00 of these funds was not deposited into any Jane P. Sogliuzzo account.

142.    Essentially all of the withdrawal amounts actually deposited into the Jane Sogliuzzo's checking account was subsequently removed via check to John Sogliuzzo or to his law firm or for his benefit.

143.    Even without considering the $273,000 in the TOD account, based upon records produced to date, it appears that John Sogliuzzo has taken approximately $395,000.00 in intervivos transfers from Jane Sogliuzzo, via checks to himself, to his children's school (Pingry), and to his legal practice; via large checks to cash; and via "shorting" the transfers from Jane P. Sogliuzzo's savings accounts to Jane P. Sogliuzzo's checking accounts.

144.    In addition, as Executor to the Estate of Mary T. Grimley, John Sogliuzzo failed to issue proper estate distribution checks due Jane P. Sogliuzzo, shorting her by an amount likely to be in excess of $200,000.

## H.  John Sogliuzzo Takes Over Mary's Finances

145.    Not long after Mary T. Grimley moved into the third floor apartment and John Sogliuzzo took over the management of her financial affairs, there occurred an unusual redemption of Mary's savings bonds.

146.    On December 27, 2002, John Sogliuzzo deposited $21,739.20 into Mary's checking account using the proceeds of savings bond redemptions.

147.    Such a large redemption was highly unusual in that Mary did not cash in her savings bonds, many of which were purchased by her and her family members from 1950 – 1980.  Instead, she lived off of her pension and Social Security benefits and the interest earned on her many savings and time deposit accounts.

148.    She believed in the old school adage of "never touching the principal."

149.    Upon information and belief, it appeared at the time that John Sogliuzzo had either convinced her, or had undertaken on his own, a program to distribute a portion of her estate to her intended beneficiaries on an annual basis.

150.    On the same date, December 27, 2002, John Sogliuzzo prepared checks in the following amounts to Mary's surviving beneficiaries:

| Beneficiary | Check Amount | Estate Share |
|---|---|---|
| John B. Sogliuzzo | $10,000 | 1/4 of 5/7 |
| Jane P. Sogliuzzo | $10,000 | 1/4 of 5/7 |
| W. Gerard Sogliuzzo | - 0 - | 1/4 of 5/7 |
| Jane E. Adkins | $7,500 | 1/4 of 5/7 |
| Our Lady of Grace CC | - 0 - | 1/7 |
| Melita Braun | $1,000 | 1/7 |

151.    The size of the checks to himself and his mother were out of proportion to Mary's other intended beneficiaries.

152.    From the period September 2002 through Mary's death in October 2006, John Sogliuzzo helped Mary with her banking and financial matters.   During this period, Mary received over $92,000 in Pension and Social Security Benefits, as shown in the table below:

| Period | Mary's Pension | Mary's Social Security Benefits |
|---|---|---|
| SEP – DEC 2002 | $ 3,543 | $ 3,632 |
| 2003 | $10,630 | $11,253 |
| 2004 | $10,630 | $11,253 |
| 2005 | $10,630 | $11,582 |
| Thru OCT 2006 | $ 8,898 | $10,045 |
| Period Total: | $44,331 | $47,765 |
| **GRAND TOTAL:** | **$92,096** | |

(Source:  Mary T. Grimley's tax returns for 2002-2006)

153.    Upon information and belief, these benefits were paid by checks via U.S. Mail. There is no record of any of these funds being deposited into any of Mary's checking or savings accounts.

154.    All of Mary's living/household expenses were paid by check, except what she

spent on groceries, which was very little at the beginning of this period, and essentially nothing in the last two years when she was fed by the live-in caretaker, Anna, whom she shared with Jane P. Sogliuzzo.

155.    Upon information and belief, John Sogliuzzo cashed these checks.  Although a fiduciary, John Sogliuzzo has provided no accounting of the receipts, disbursements and uses of any of these funds, and he has refused to do so.

## I.  John Sogliuzzo's Misappropriations from Mary T. Grimley's Accounts

156.    The documents that John Sogliuzzo eventually turned over to his sister indicate that from the time she moved into the Hoboken House, John Sogliuzzo redeemed Mary's United States Savings Bonds on twenty-seven (27) occasions starting on December 27, 2002 and ending on September 22, 2006.  The total of these redemptions equal $352,278.45.

157.    Of that total, twenty-one (21) of the redemptions were not fully deposited in any account held by Mary Grimley totaling a $79,975.78 shortage.  This "shorting" started in January 31, 2005 and continued until September 22, 2006.

158.    From December 23, 2003 to October 10, 2006, John Sogliuzzo withdrew $124,867.42 from Mary's Haven Savings Bank savings account number *1699.  Of that, seven (7) withdrawals were not fully deposited with a total shortage of $28,850.00.  This "shorting" started on August 6, 2006 and continued until September 15, 2006.

159.    From December 30, 2002 until September 19, 2006, John Sogliuzzo wrote thirty-two (32) checks to himself and his family totaling $200,106.00 from Mary's checking account. Of these checks, the largest were the ones he wrote to Gaye Torrance on February 10, 2005 in the amount of $20,000.00; and another he wrote to himself in the same amount on September 6, 2006.

160.   In addition to these, John Sogliuzzo wrote thirty (30) large checks in the amounts of $1,000.00 or more to "Cash" on Mary's accounts totaling $43,267.00 starting on January 7, 2003 and ending on November 28, 2007.  The largest check of $4,500.00 written to cash was written on September 1, 2005, and the smallest check was of $1,000.00 was written on March 25, 2005.

161.   Therefore, prior to Mary's death, John B. Sogliuzzo wrote approximately thirty (30) checks to himself in the amount of $161,865.80, five (5) checks to his wife, Gaye Torrance totaling $41,000.00, one (1) check to John B. Sogliuzzo, Esq. in the amount of $8,500.00 and approximately thirty (30) large checks to Cash in the amount of $52,278.61, for a total in checks of $263,644.00.

162.   In addition, during Mary's lifetime, John Sogliuzzo shorted her savings bond redemptions in the amount of at least $79,975.78 and shorted withdrawals from savings accounts of $28,850.00.  As a consequence, during her lifetime, John Sogliuzzo and his wife, L. Gaye Torrance, received $372,470.00 from Mary's accounts.

163.   Additionally, there is no evidence that the approximately $70,000.00 to $80,000.00 in cash collected from the cookie tins, clothes, drawers, etc., and given to John B. Sogliuzzo, when her apartment was cleaned out, was ever deposited into any of Mary's account.

164.   Finally, there is no evidence that the $92,000.00 from Mary's pension and social security ever made it to her accounts or was used for her care.

165.   Upon information and belief, the checks written to John B. Sogliuzzo and his wife, Gaye, were deposited into either joint accounts, John B. Sogliuzzo's accounts, L. Gaye's accounts, or John B. Sogliuzzo's attorney business account or possibly the accounts of

their children.

166.     The monies John B. Sogliuzzo obtained in cash or withheld from savings bond redemptions and savings account withdrawals were either similarly deposited in the above accounts or kept as cash and spent by John B. Sogliuzzo and/or L. Gaye Torrance for their own benefit or that of their family.  These intervivos conversions total in excess of $530,000.00.

## J.  Transfers from The Estate of Mary T. Grimley

167.     As Executor to the Mary T. Grimley Estate, John B. Sogliuzzo made two (2) major deposits into the Estate Trust account, as listed below:

| November 1, 2006 | $95,854 | Roughly 50% of Mary's various saving accounts |
| March 22, 2007 | $117,662 | Redemption of a portion of Mary's remaining Savings Bonds |

168.     John B. Sogliuzzo then proceeded to draw down this account by writing eighteen (18) checks to himself, and one (1) check to his law practice in the amounts listed below:

| Total checks to John Sogliuzzo: | $150,350 |
| Checks to John Sogliuzzo (Esq): | $   5,000 |
| Subtotal | $155,350 |

169.     By November 8, 2007, having paid both legitimate estate expenses and having written the $155,350.00 in checks for his own benefit, the Mary T. Grimley Estate Trust Account was depleted down to only $5,927.00.

170.     Then on November 8, 2007, John B. Sogliuzzo closed out Mary's remaining bank accounts depositing another $100,766.00 into the Estate trust account.

171.     From this total John Sogliuzzo wrote three (3) checks of $28,750.00 to each of Jane E. Adkins, Melitta "Millie" Braun, and Our Lady of Grace Catholic Church.  No definitive distribution checks were written to John B. Sogliuzzo or Jane P. Sogliuzzo at that time.

172.   Per Mary's Will, the distribution of her Estate was to be:

| | | | |
|---|---|---|---|
| John B. Sogliuzzo | 1/3 (5/7) | = | 23.8% |
| Jane P. Sogliuzzo | 1/3 (5/7) | = | 23.8% |
| Jane E. Adkins | 1/3 (5/7) | = | 23.8% |
| Melitta Brown | 1/7 | = | 14.3% |
| Our Lady of Grace Catholic Church | 1/7 | = | 14.3% |

173.   Without considering the greatly depleted value of the Estate, due to his intervivos conversions, the checks written were in the wrong proportion.  If Millie and Our Lady of Grace Catholic Church received $28,750.00, Jane E. Adkins and her mother should have received $48,850.00 each. Jane E. Adkins only received $28,750.00.

174.   Jane P. Sogliuzzo was issued no distribution check at that time, but John B. Sogliuzzo wrote two (2) $2,500.00 checks to her – one before these distributions, on November 5, 2007, and one after, on January 24, 2008.

175.   Before making the December 19, 2007 "final" distribution to the beneficiaries, John B. Sogliuzzo, as executor, had cashed in $117,658.58 in United States Savings Bonds.

176.   On January 4, 2008, John made one additional redemption of Mary's United States Savings Bonds in the amount of $22,593.04.

177.   Before making the December 2007 distributions to the other beneficiaries, John Sogliuzzo wrote twelve (12) checks in the amount of $127,500.00 to himself and L. Gaye Torrance.

178.   After the final distribution of December 19, 2007, John wrote six (6) additional checks to himself and L. Gaye Torrance totaling $22,850.00 starting on January 4, 2008 and ending on February 21, 2008.

179.   In addition, John B. Sogliuzzo wrote one check to his law firm in the amount of $5,000.00 on February 28, 2007.

180.   John B. Sogliuzzo proceeded to draw down the account to a balance of $268.08 on February 22, 2008.

181.   However, John had forgotten about the income tax liability for the Mary T. Grimley Estate.  With essentially no money in the account, John was forced to find $30,000.00 to pay these tax obligations.

### K.  The Alex Brown Account and the Set Up of the TOD Account

182.   In October 2007, rather than a year earlier as John Sogliuzzo had told Jane E. Adkins, when Jane P. Sogliuzzo was ninety-two (92) years old with her eyesight and her faculties failing and her breathing impaired, John B. Sogliuzzo arranged for a meeting between his mother and his Alex Brown broker, Tom Rodman.

183.   Upon information and belief, at this meeting which was held at a local restaurant, someone apparently prepared a handwritten note authorizing the transfer of Decedent's Alex Brown Account to a TOD account which Jane P. Sogliuzzo apparently signed.  She also signed the official transfer form.

184.   By October 2007, Jane P. Sogliuzzo's eyes burned non-stop and she kept them closed most of the time.

185.   Upon information and belief, John Sogliuzzo afforded Jane Sogliuzzo no other counsel other than his own and that of his Alex Brown broker, Tom Rodman. Upon information and belief, Tom Rodman had no personal knowledge of Jane P. Sogliuzzo's will, potential beneficiaries, and other financial assets and was not professionally qualified to provide legal advice.

186.   Upon information and belief, on October 17, 2007, Jane P. Sogliuzzo's Alex Brown Account was converted to a TOD account to John B. Sogliuzzo's benefit in the sole

28

presence of Tom Rodman using authorization documents prepared by Tom Rodman.

187.    At the time of Jane P. Sogliuzzo's death on February 29, 2008, the TOD account was worth approximately $273,563.31.

188.    In April 2008, in spite of knowing that this account was in dispute, John B. Sogliuzzo transferred $107,000.00 of the money from Jane P. Sogliuzzo's Alex Brown Account to a "special account" at his own bank, Hilltop Community Bank, to fund his own account.  Upon information and belief, he used $30,000.00 of these monies to cover the taxes due from Mary T. Grimley's Estate.

189.    Upon information and belief, at the time the TOD account was set up, Jane P. Sogliuzzo had no counsel other than her son John B. Sogliuzzo and never intended to leave these monies exclusively to John B. Sogliuzzo.

190.    Upon information and belief, at the time the TOD account was set up, because of her advanced age and deteriorated physical and mental condition, Jane P. Sogliuzzo could not read the documents, and therefore could not understand the act or its consequences.

191.    In fact, John B. Sogliuzzo had prepared and had his mother sign a General Power of Attorney because of her incapacitation back on November 20, 2006 almost a year earlier.

192.    Upon information and belief, at the time the TOD account was set up, Jane P. Sogliuzzo did not know of, and was unaware of the activities of her son, John B. Sogliuzzo, with respect to herself and/or Mary T. Grimley.

193.    According to John B. Sogliuzzo, he only told his mother he had financial pressures and needed help from time to time.

### L.  The Estate of Jane P. Sogliuzzo

194.    Confronted with his own actions on or about July 2008, John B. Sogliuzzo voluntarily filed an Order to Show Cause resigning as Executor of the Estate of Jane P. Sogliuzzo.

195.    Jane Adkins assumed the role of Executrix pursuant to a Court Order dated September 2, 2008.

196.    John Sogliuzzo has steadfastly refused to turn over the Alex Brown TOD account to the Estate or to return the monies that he transferred out of the TOD account based upon his contention that he has already spent all the monies, approximately $1 million, that he had taken from Mary T. Grimley's and Jane P. Sogliuzzo's accounts.

197.    On or about September 22, 2008, on behalf of she and the Estate, Jane Adkins filed a Verified Complaint and Order to Show Cause in the Superior Court of New Jersey, Hudson County, Chancery Division seeking:  (i) the return of the monies transferred intervivos to John B. Sogliuzzo and for the benefit of his family; (ii) the titling of the Alex Brown TOD account into the Estate of Jane P. Sogliuzzo; and (iii) the return of the $107,000.00 transferred out of the Alex Brown TOD account that were not used for Jane Sogliuzzo's Estate and benefit. A true copy of that Verified Complaint is annexed hereto as **Exhibit A**.

198.    Jane E. Adkins was a direct, major beneficiary of Mary T. Grimley and Jane P. Sogliuzzo, and she was intentionally harmed by the actions of John B. Sogliuzzo.

199.    Although Jane E. Adkins regarded it as a joke, at several family gatherings from 2000 to 2007, John B. Sogliuzzo announced that he "was going to screw Janie out of the house," meaning her parents' Hoboken House.  This remark was heard by several of Jane E. Adkins' cousins.

200.    Jane Adkins had brain surgery to remove a tumor on December 31, 2003.  After Jane Adkins' brain surgery, John Sogliuzzo would tell the people at different parties/events that Jane Adkins' did not know anything or could not understand things because "she has a hole in her head" or that "it's the toomer."

201.    In addition, Jane Adkins was also upset by John Sogliuzzo and/or Gaye Torrance constant criticizing (i) Charlie's and her careful spending habits; (ii) the fact that she and Charlie do not fly first-class like they do; and (iii) the fact that Charlie and Jane Adkins live a far more financially-reserved life-style, unlike their luxury lifestyle of country clubs, personal shoppers, expensive clothing, fine dining out and expensive vacations.

202.    Considering just the liquid assets of the two major estates, in which John Sogliuzzo and Jane Adkins were to be equal beneficiaries, John Sogliuzzo obtained, or sought to obtain, a financial gain of over $1.3 million over his sister, Jane Adkins, as shown below:

### Distributions per John B. Sogliuzzo

| Financial Assets | To John B. Sogliuzzo | To Jane E. Adkins |
|---|---|---|
| Mary T. Grimley | $691,218 | $28,750 |
| Jane P. Sogliuzzo | $637,889 | - 0 - |
| TOTAL: | $1,329,097 | $28,750 |

203.    By his actions perpetrated over nine years, John B. Sogliuzzo, intentionally and for his own benefit, sought to essentially disinherit his sister, Jane Adkins, from nearly the entirety of her rightly due financial expectations from her family assets, using his trusted, confidential, and fiduciary relationships.

204.    Confronted with the above accusations from March 2008 to July 2008, John Sogliuzzo repeatedly lied to both Jane and Charlie Adkins about the TOD account and his other financial misdealing, declaring on more than one occasion that he never stole from anyone, repeatedly attacking Jane Adkins for questioning his honesty and his stewardship, and chastising

her for being "all about the money."

## FIRST COUNT

## BREACH OF FIDUCIARY DUTY – MARY T. GRIMLEY

205.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 204 of the Complaint as if set forth herein at length.

206.   From the time Mary moved into the 3rd floor apartment in the Hoboken House in September, John Sogliuzzo acted as a fiduciary for Mary with respect to her banking.

207.   Initially acting informally and then as of February 2004 under a financial Power of Attorney, John Sogliuzzo misappropriated $79,976.00 from savings bond redemptions; $28,850.00 from her savings account number **699; wrote $200,116.00 in checks to himself and his wife; wrote $8,500.00 in checks to his law firm; and wrote $43,267.00 in unusually large checks to "Cash."

208.   John was trusted with another $70,000.00 plus in cash he was to deposit into her accounts which has been unaccounted for and approximately $92,000.00 in pension and social security benefits for the period September 2002 to October 2006.

209.   Under N.J.S.A. 46:2B-8.13(a), John Sogliuzzo had a duty to act for the sole benefit of Mary.

210.   Under N.J.S.A. 46:2B-8.13(b), John Sogliuzzo had a duty to maintain accurate books and records and account for all of the financial transactions he executed under a Power of Attorney.

211.   John Sogliuzzo breached his fiduciary duty to Mary in that he misappropriated over $360,000.00 for his and his family's benefit to the detriment of Mary during her lifetime. Another $160,000.00 plus has not been accounted for.

212.     In addition to acting as an attorney in fact, John Sogliuzzo is an attorney at law of the State of New Jersey, and he practices probate and criminal law.

213.     John Sogliuzzo's actions as aforesaid constitute breaches of:   (a) the duty of loyalty; (b) the breach of the duty to exercise reasonable skill and care; (c) negligence and failure to perform his duties; (d) attorney malpractice; (e) improper exercise of power causing damage to plaintiff.

214.     As a consequence of these breaches, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment for damages; punitive damages; attorney's fees and expenses; costs of court; expenses; interest and such other and further relief which is just under the circumstances.

## SECOND COUNT

## BREACH OF FIDUCIARY DUTY – MARY T. GRIMLEY'S ESTATE

215.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 214 of the Complaint as if set forth herein at length.

216.     Mary died on October 16, 2006.

217.     John Sogliuzzo assumed the role of Executor of her Estate on February 4, 2007

218.     In his role as Executor, John Sogliuzzo wrote checks to himself and his law practice in the amount of $155,350.00 while shorting the other beneficiaries of the Estate including Plaintiff to whom he distributed only $28,500.00 and her mother to which he distributed only $5,000.00.

219.     In his role as Executor of the Estate, John Sogliuzzo improperly transferred $107,000.00 out of the Alex Brown Account, $30,000.00 of which he used as taxes for Mary's Estate, and $31,250 of which he transferred to his personal accounts.

220.    John Sogliuzzo wrongfully and intentionally misrepresented that the single $28,750.00 distribution to Jane Adkins was her total distribution from Mary's Estate.

221.    John Sogliuzzo failed to pay his mother, Jane P. Sogliuzzo, her proper distribution from Mary's Estate during her lifetime (approximately $200,000); therefore, further damaging Plaintiff as a fifty percent (50%) beneficiary of her mother's Estate.

222.    John Sogliuzzo's acts, as aforesaid, constitute breaches of fiduciary duties with regard to Mary's estate and to his obligations owed to Plaintiff as a beneficiary of the Estate of Mary.

223.    Despite Plaintiff's repeated requests to do so, John Sogliuzzo has not accounted for the assets of Mary's Estate or the disposition of the funds which he misappropriated during her lifetime; nor has he returned these funds to the estate or to the rightful beneficiaries.

224.    As a consequence of John Sogliuzzo's breaches of fiduciary duty, Plaintiff Jane Adkins has been damaged.

**WHEREFORE,** Plaintiff demands judgment for damages; punitive damages; attorney's fees and expenses; costs of court; expenses; interest and such other and further relief which is just under the circumstances.

## THIRD COUNT

### ATTORNEY MALPRACTICE AGAINST JOHN B. SOGLIUZZO IN THE ESTATE OF MARY T. GRIMLEY

225.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 224 of the Complaint as if set forth herein at length.

226.    Both before and after her death, John Sogliuzzo wrote checks to his law firm, from Mary's accounts and later from the Estate Account.

227.    In providing legal, notary and fiduciary services to Mary and the Estate of Mary,

34

John Sogliuzzo did not exercise the care and skill of a reasonable practitioner rendering such services.

228. In providing legal, notary and fiduciary services to Mary, John Sogliuzzo violated trust, duties, obligations, standard of care and ethical standards required of his profession and his position as an officer of the court.

229. As a licensed attorney serving as executor of the estate of Mary T. Grimley, John B. Sogliuzzo knowingly and intentionally violated his obligations to carry out the specific bequests stated in her will, for his own personal benefit.

230. Before Mary Grimley's death and later to the Estate, John Sogliuzzo charged legal fees that were unreasonable for any services being rendered.

231. As the Executor of the Estate of Mary Grimley, John Sogliuzzo charged legal fees without providing any services and without invoices; timesheets; etc.

232. As the Executor of the Estate of Mary Grimley and the Estate of Jane P. Sogliuzzo, John Sogliuzzo comingled funds between the Estates and between his attorney business account; failing to keep client monies separate from those of his business entirety to the detriment of the Plaintiff.

233. John Sogliuzzo as an attorney owed a duty to the Plaintiff as she was a beneficiary of both the Estates of Mary and of her mother.

234. As a consequence of John Sogliuzzo's negligent performance of his duties as an attorney, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment for damages; punitive damages; attorney's fees and expenses; costs of court; expenses; interest and such other and further relief which is just under the circumstances.

## FOURTH COUNT

### NEGLIGENCE OF JOHN B. SOGLIUZZO CAUSING HARM TO JANE E. ADKINS AS TO MARY T. GRIMLEY AND THE ESTATE OF MARY T. GRIMLEY

235.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 234 of the Complaint as if set forth herein at length.

236.    John Sogliuzzo's actions, as aforesaid as agent and fiduciary for Mary, constitute negligent handling of her personal assets.

237.    Jane Adkins was an intended beneficiary of the Estate of Mary as well as the Estate of her mother and therefore it was foreseeable that she would be harmed by his actions.

238.    John Sogliuzzo's negligent actions as attorney, agent, fiduciary and executor for Mary constituted an unreasonable risk of harm to Jane Adkins.

239.    As a result of John Sogliuzzo's actions, Jane Adkins has been damaged.

**WHEREFORE,** Plaintiff demands judgment for damages; punitive damages; attorney's fees and expenses; costs of court; expenses; interest and such other and further relief which is just under the circumstances.

**The FIFTH COUNT and paragraphs 240 through 246 are intentionally omitted.**

### SIXTH COUNT

### MALICIOUS MISREPRESENTATION CAUSING HARM

247.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 246 of the Complaint as if set forth herein at length.

248.    As set forth herein John made misrepresentations of material facts to his mother, cousins and his sister.

249.    John knew that his statements were false and were made in reckless and careless

disregard for the truth.

250.   John intended that each of Mary Grimley, Jane P. Sogliuzzo and Jane E. Adkins be induced to act upon the misrepresentations.

251.   Each of Mary Grimley, Jane P. Sogliuzzo and Jane E. Adkins acted upon the misrepresentations and as a consequence each was damaged.

252.   Each of the Plaintiffs were reasonably expected to be recipients of the misrepresentations.

**WHEREFORE,** Plaintiff demands judgment for damages; punitive damages; compensatory damages; attorney's fees and expenses; costs of court; expenses; interest and such other and further relief which is just under the circumstances.

## SEVENTH COUNT

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY JOHN B. SOGLIUZZO AGAINST JANE E. ADKINS

253.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 252 of the Complaint as if set forth herein at length.

254.   Although John Sogliuzzo raided both his mother's and cousin Mary's accounts both in their lifetime and as Executor of their Estates, John Sogliuzzo told his sister that (i) their mother wanted him to have all the money in her Alex Brown account; (ii) that for Plaintiff Jane E. Adkins it was all about the money; (iii) that $28,750.00 was her total share of Mary's Estate; and (iv) that he had done nothing wrong and how dare she question his integrity.

255.   In reality, John Sogliuzzo had stolen monies from his cousin, his mother, his sister, Millie Braun, and the church, in the process violating criminal laws, ethics, morals and everyone's trust; has steadfastly refused to fulfill his obligations, to account for these transgressions, and to make restitution, even after he was caught.

256.    Jane Adkins had a brain tumor removed five (5) years ago and occasionally suffers from seizures associated with that procedure.  The extent and severity of these seizures is directly affected by stress and tension.

257.    John Sogliuzzo was aware of her condition and knowingly and intentionally caused her emotional distress.

258.    John Sogliuzzo is an attorney who specializes in (among other areas) white collar criminal litigation and probate disputes.  He has litigated the issues of undue influence to a successful conclusion.

259.    As a result of the intentional acts of John Sogliuzzo, Jane Adkins' seizures have increased in severity and frequency requiring Jane Adkins to be hospitalized on July 27-28, 2008 and additional medications to be prescribed to attempt to control her increased anxiety associated with the on-going dispute with her brother and his behavior.

260.    To date, the success of the additional medications has been limited. The frequency of her seizures has increased and can be shown to be directly relating to having to deal not only with the disturbing and continual revelations of John's numerous transgressions, but also with John's manner of dealing with Jane Adkins about the violation to include denials, counter attacks, cover-ups, mistruths, defamation, misrepresentations and withholding of documents and of his required accounting records. His intentional acts have forced Jane Adkins to be continually exposed to these very emotional, stressful and hurtful circumstances.

261.    By his intentional actions, John Sogliuzzo has done irreparable emotional harm to Jane Adkins regarding Jane's now unresolved relationship with her deceased mother, Jane P. Sogliuzzo, in that Jane Adkins will never be able to discuss these circumstances with her..

262.    By his transgressions and his subsequent actions, John Sogliuzzo is responsible

for causing Jane Adkins to undergo additional emotional distress because of the resultant strained and/or damaged relationships with other members of her family, including her niece, her nephew and her cousins.

263.    As a consequence, Plaintiff has been emotionally and physically damaged.

**WHEREFORE,** Plaintiff demands judgment for damages; punitive damages; attorney's fees and expenses; costs of court; expenses; interest and such other and further relief which is just under the circumstances.

## EIGHTH COUNT

## FRAUDULENT CONVEYANCE AGAINST JOHN B. SOGLIUZZO AND L. GAYE TORRANCE

264.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 263 of the Complaint as if set forth herein at length.

265.    Plaintiff Jane Adkins is a creditor of the Estate of Mary and the Estate of Jane Sogliuzzo.

266.    John Sogliuzzo through his actions herein has transferred monies to his wife Gaye Torrance; to himself; to his law firm; and for the benefit of his children for less than adequate consideration.

267.    These transfers were intentionally made to defraud Jane Adkins and to avoid paying her what she was rightfully due.

268.    These transfers were made of property entrusted to John Sogliuzzo and were made for his and Gaye Torrance's benefit.

269.    As a consequence, the Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo and Gaye Torrance, jointly and severally for damages; attorney's fees and expenses; interest; costs of suit; and such

other and further relief as this Court deems just.

## NINTH COUNT

## UNDUE INFLUENCE

270.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 269 of the Complaint as if set forth herein at length.

271.   During all pertinent times, John Sogliuzzo occupied a confidential relationship with his mother.

272.   The transfer of her monies during her lifetime and the designation of the Alex Brown Account to a TOD account to John Sogliuzzo's benefit was the result of undue influence.

273.   As a result, the Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment for damages; attorney's fees and expenses; costs of court; punitive damages; expenses; interest and such other and further relief which is just under the circumstances.

## TENTH COUNT

## BREACH OF DUTY – NEGLIGENCE – RODMAN D/B ALEX BROWN

274.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 273 of the Complaint as if set forth herein at length.

275.   Tom Rodman owed a duty to Jane Sogliuzzo as her financial adviser and manager of her Alex Brown account.

276.   Tom Rodman owed a duty to Jane Adkins as a beneficiary of Jane Sogliuzzo's Estate.

277.   Tom Rodman was, upon information and belief, the financial adviser to John Sogliuzzo and manager of his, his wife's and their children's accounts at Alex Brown.

40

278.    Tom Rodman had a conflict of interest when he met with an ill ninety-two (92) year old woman (Jane P. Sogliuzzo) and did not exercise the care necessary to ascertain whether creating a TOD account to John Sogliuzzo's benefit was her voluntary and informed decision and whether she had the capacity to make that decision and whether she had had an opportunity for proper, independent counsel.

279.    Tom Rodman breached the duty owed to Jane Sogliuzzo by failing to see his own conflict, meeting with a ninety-two (92) year old woman to make this decision to the benefit of his longtime clients and himself without taking the proper safeguards in this, an area fraught with abuse.

280.    Upon information and belief, Tom Rodman was negligent in the hasty transfer of the assets in the TOD account, to a newly created account for his long-term client, John Sogliuzzo, putting his own interest first and failing to exercise the standard of care required of a fiduciary, by DB Alex Brown's own procedures, and by the terms of the TOD agreement, to verify John B. Sogliuzzo had been appointed executor of the estate and that there were no disputes with regard to the TOD account.

281.    The Plaintiff, Jane E. Adkins, was a foreseeable victim of Tom Rodman's negligence.

282.    Tom Rodman's standard of care was not reasonable under the circumstances.

283.    As a consequence of Tom Rodman's negligence, Plaintiff, Jane E. Adkins, has been damaged.

**WHEREFORE,** Plaintiff demands judgment against Tom Rodman for damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## ELEVENTH COUNT

### MALPRACTICE/RODMAN/ALEX BROWN

284.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 283 of the Complaint as if set forth herein at length.

285.    Tom Rodman holds himself out as a Certified Financial Planner.

286.    Tom Rodman is employed in that capacity by Alex Brown.

287.    As a client of both Tom Rodman and Alex Brown, Tom Rodman as a Certified Financial Planner owed a duty to Jane P. Sogliuzzo of a reasonable professional in his/their field.

288.    Tom Rodman as a consequence, Alex Brown did not exercise the standard of one of a professed in his and its field.   The actions of Rodman and Alex Brown constitute professional malpractice.   As a consequence of his and Alex Brown's malpractice, plaintiff has been damaged.

**WHEREFORE**, Plaintiff seeks judgment against Tom Rodman and Alex Brown for damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## TWELFTH COUNT

### AIDING IN THE COMMISSION OF A TORT – TOM RODMAN

289.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 288 of the Complaint as if set forth herein at length.

290.    The actions of Tom Rodman as described herein constitute active participation and aid to John Sogliuzzo in exercising undue influence over his mother.

291.    The actions of Tom Rodman as described herein constitute active participation and aiding a plan designed by John Sogliuzzo to fraudulently induce his mother to set up a TOD

42

account for her son to the detriment of her daughter, Plaintiff, Jane E. Adkins.

292.    As a consequence, Plaintiff Jane Adkins has been damaged.

**WHEREFORE,** Plaintiff demands judgment against Tom Rodman for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## THIRTEENTH COUNT

## CONSPIRACY TO COMMIT TORT
## JOHN B. SOGLIUZZO AND TOM RODMAN

293.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 292 of the Complaint as if set forth herein at length.

294.    John Sogliuzzo and Tom Rodman agreed that Tom Rodman would meet with Jane Sogliuzzo to make her Alex Brown account a TOD account payable to John Sogliuzzo.

295.    Upon information and belief, Jane P. Sogliuzzo was not competent to make the decision to change the account designation.

296.    Upon information and belief, Jane Sogliuzzo did not know the nature of or extent of her son's transgressions both with respect to herself and Mary when she met with Rodman.

297.    The design of the meeting was to commit a fraud on Jane Sogliuzzo and to unduly influence her to make the TOD designation.

298.    As a consequence of John Sogliuzzo's and Todd Rodman's actions in furtherance of the conspiracy, Jane Adkins has suffered special damages.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo and Tom Rodman for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

### FOURTEENTH COUNT

### AIDING THE COMMISSION OF A TORT- L. GAYE TORRANCE

299.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 298 of the Complaint as if set forth herein at length.

300.    Gaye Torrance is the wife of John Sogliuzzo.

301.    Checks were written to Gaye Torrance by John Sogliuzzo both before and after Mary Grimley's death.

302.    Upon information and belief, these checks were signed with the name Gaye Torrance and deposited into her own accounts or into her joint accounts held with John Sogliuzzo.

303.    Further, Gaye Torrance knew about the deposits John Sogliuzzo was supposed to make for Mary of the $70,000.00 plus in cash recovered while John Sogliuzzo and Jane Adkins cleaned her apartment.

304.    Upon information and belief, Gaye Torrance has actively participated in the cover up of these activities and in the removal of incriminating documents of both estates that were kept at the Hoboken House.

305.    Upon information and belief, Gaye Torrance either participated in, aided in or encouraged John Sogliuzzo in his actions as aforesaid.

306.    Gaye Torrance either through her silence or through active participation ratified the actions done for her benefit.

307.    As a consequence of Gaye Torrance's actions, Jane Adkins has been damaged.

**WHEREFORE,** Plaintiff demands judgment against Gaye Torrance for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further

relief as this Court deems just.

## FIFTEENTH COUNT

### CONSPIRACY TO COMMIT TORT
### L. GAYE TORRANCE AND JOHN B. SOGLIUZZO

308.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 307 of the Complaint as if set forth herein at length.

309.    Gaye Torrance and John Sogliuzzo agreed to misappropriate and retain monies from Mary during her lifetime.

310.    The misappropriation constitutes fraud, conversion, theft by deception, undue influence and numerous other torts.

311.    As a result of their conspiracy and the acts of John Sogliuzzo as described herein, Plaintiff suffered special damages.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo and Gaye Torrance for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## SIXTEENTH COUNT

## THEFT BY DECEPTION

312.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 311 of the Complaint as if set forth herein at length.

313.    The actions of John Sogliuzzo and Gaye Torrance as described herein both in cases of Mary and Jane Sogliuzzo constitute theft by deception against Plaintiff.

314.    As a consequence, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo and Gaye Torrance for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such

other and further relief as this Court deems just.

## SEVENTEENTH COUNT

## CONVERSION AGAINST JOHN B. SOGLIUZZO

315.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 314 of the Complaint as if set forth herein at length.

316.    The acts of John Sogliuzzo as set forth herein, constitute a wrongful conversion of the assets of Mary Grimley.

317.    The acts of John Sogliuzzo as set forth herein constitute a wrongful conversion of the assets of Jane Sogliuzzo.

318.    John Sogliuzzo willfully and intentionally converted those assets and deprived Jane Adkins of her right to possess her rightful share of those assets.

319.    Demand has been made on John Sogliuzzo for the return of these assets and all demands have been refused.

320.    As a consequence of such conversion, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## EIGHTEENTH COUNT

## BREACH OF FIDUCIARY DUTY AGAINST TOM RODMAN

321.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 320 of the Complaint as if set forth herein at length.

322.    The acts of John in having his mother set up the TOD account represent a breach of his fiduciary duty to her.

323.    The actions of John Sogliuzzo and Tom Rodman in transferring the assets out of a TOD account and in transferring $107,000.00 out of that account and into a special account for John's benefit represent a breach of John Sogliuzzo's fiduciary duty to the Estate of Jane Sogliuzzo and to his sister Jane Adkins as a beneficiary of the Estate.

324.    The acts of Tom Rodman represent a participation in the acquisition, disposition, and assignment and/or transferring of assets to the fiduciary by failing to inquire whether the transfer involved a breach of the fiduciary duty.

325.    As a consequence of Tom Rodman's participation, he is liable to the Plaintiff for her damages incurred as a result of the breach of the fiduciary.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo and Tom Rodman for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

<div align="center">

**NINETEENTH COUNT**

**FRAUDULENT CONCEALMENT BY FIDUCIARY
JOHN SOGLIUZZO (INTERVIVOS TRANSFERS)**

</div>

326.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 325 of the Complaint as if set forth herein at length.

327.    From September 2002 to her death, John Sogliuzzo was in a fiduciary relationship with his cousin Mary.

328.    John Sogliuzzo was misappropriating monies from the cash found in her apartment; from his redemption of Mary's savings bonds; by shorting deposits to her accounts; and by writing checks to himself and his wife and by otherwise misappropriating funds.

329.    John Sogliuzzo intentionally concealed by not disclosing facts to Mary.

330.    As a consequence, the Estate of Mary and Plaintiff as a beneficiary of the Estate

<div align="center">47</div>

of Mary and as a beneficiary of the Estate of Jane Sogliuzzo has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

<div align="center">

**TWENTIETH COUNT**

**FRAUDULENT CONCEALMENT AGAINST
JOHN B. SOGLIUZZO AS FIDUCIARY OF JANE P. SOGLIUZZO**

</div>

331.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 330 of the Complaint as if set forth herein at length.

332.    Since his father's death in January 1999, John Sogliuzzo had a confidential relationship with his mother.

333.    John Sogliuzzo had a fiduciary obligation to mother during her lifetime and as a consequence to his sister who is a beneficiary of her estate.

334.    John misappropriated funds from his mother during her lifetime, to the extent that there are no liquid financial assets to be bequeathed to her daughter, Jane Adkins.

335.    John intentionally concealed these material facts from his mother.

336.    Upon information and belief had Jane Sogliuzzo known what her son was doing with regard to Mary and her own monies, even if she was competent to do so, she never would have approved John Sogliuzzo's financial withdrawals, and would have never set up the TOD account for his sole benefit.

337.    As a consequence of his fraudulent concealment, Jane Adkins has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further

relief as this Court deems just.

## TWENTY-FIRST COUNT

## INTENTIONAL FRAUD AS TO JOHN SOGLIUZZO

338.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 337 of the Complaint as if set forth herein at length.

339.   According to John Sogliuzzo he told his mother that he was having business problems and needed the monies in her TOD account.

340.   He did not however mention to her his theft of hundreds of thousands of dollars from her or her cousin Mary.

341.   As a fiduciary, John Sogliuzzo had the obligation to disclose and account for his actions.

342.   The knowing failure of John to disclose his actions with his intent that his mother rely on his silence.

343.   Upon information and belief, the agreement to enter into a contract to change the Alex Brown account to TOD status, even if she was competent, was the result of her reliance that John Sogliuzzo was a good and trustworthy individual.

344.   As a consequence, the Plaintiff as a beneficiary of the Estate of Jane Sogliuzzo has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## TWENTY-SECOND COUNT

### BREACH OF FIDUCIARY DUTY
### ESTATES OF MARY T. GRIMLEY AND JANE P. SOGLIUZZO

345.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 344 of the Complaint as if set forth herein at length.

346.    John Sogliuzzo was an Executor of the Estates of Mary and Jane Sogliuzzo.

347.    Jane Adkins was a beneficiary of each of these Estates.

348.    John Sogliuzzo owed a fiduciary duty to Jane Adkins.

349.    John Sogliuzzo's actions as aforesaid in inter alia misappropriated funds; writing checks to his own benefit and to his wife; intentionally preferring himself over other beneficiaries constitute breaches of his fiduciary duties of the two Estates.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## TWENTY-THIRD COUNT

### PUNITIVE DAMAGES AGAINST JOHN SOGLIUZZO

350.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 349 of the Complaint as if set forth herein at length.

351.    John Sogliuzzo intentionally and knowingly committed torts against Mary; Jane Sogliuzzo; and his sister Jane Adkins.

352.    As a consequence and result of John Sogliuzzo's actions, Jane Adkins has been damaged.

353.    John Sogliuzzo's actions were precipitated by his own greed and his actions were effectuated with actual malice and wanton disregard of his sister who he knew and intended to be

harmed by his conduct.

354.    In addition to compensatory damages, Jane Adkins is entitled to punitive damages.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

<div align="center">

**TWENTY-FOURTH COUNT**

**ELDER ABUSE**

</div>

355.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 354 of the Complaint as if set forth herein at length.

356.    John Sogliuzzo's actions as detailed herein with both Jane P. Sogliuzzo and Mary T. Grimley constitute the tort of elder abuse.

357.    As a consequence of John Sogliuzzo's actions, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; punitive damages; interest; costs of suit; and such other and further relief as this Court deems just.

<div align="center">

**TWENTY-FIFTH COUNT**

**RESPONDENT SUPERIOR AGAINST ALEX BROWN**

</div>

358.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 357 of the Complaint as if set forth herein at length.

359.    Tom Rodman's wrongful actions as described herein were committed within the scope of his employment duties with Alex Brown.

360.    Tom Rodman's actions as described herein were the kind of actions that Tom

Rodman is employed to perform.

361.    Tom Rodman's actions in converting Jane Sogliuzzo's account to a TOD account for the benefit of John Sogliuzzo and in transferring the assets to John B. Sogliuzzo prematurely and negligently were on Alex Brown's time and within its space.

362.    Tom Rodman's actions were intended in part to benefit Alex Brown.

363.    Alex Brown's failure to exercise reasonable care and supervision over Tom Rodman resulted in damages to Plaintiff.

**WHEREFORE,** Plaintiff demands judgment against Alex Brown under the doctrine of respondent superior for damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just

## TWENTY-SIXTH COUNT

## WASTING ANOTHER'S PROPERTY OR INHERITANCE

364.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 363 of the Complaint as if set forth herein at length.

365.    As set forth herein, John Sogliuzzo wasted and destroyed Jane Adkins' rightful inheritance from her mother and her cousin Mary.

366.    As a consequence Plaintiff Jane Adkins has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for treble damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## TWENTY-SEVENTH COUNT

## CONVERSION OF MARY T. GRIMLEY'S ASSETS

367.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 366 of the Complaint as if set forth herein at length.

368.    The actions of John Sogliuzzo as set forth herein constitute unlawful conversion of Mary's assets both during her lifetime and from her estate.

369.    The Plaintiff is a beneficiary of Mary and her Estate.

370.    As a consequence of John Sogliuzzo's conversion of Mary's assets, the Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## TWENTY-EIGHTH COUNT

## CONVERSION OF JANE P. SOGLIUZZO'S ASSETS

371.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 369 of the Complaint as if set forth herein at length.

372.    The actions of John Sogliuzzo as set forth herein constitute unlawful conversion 370 of Jane Sogliuzzo's assets both during her lifetime and from her estate.

373.    As a consequence of John Sogliuzzo's conversion of Jane Sogliuzzo's assets the Plaintiff, as a beneficiary of Jane Sogliuzzo has been damaged.

**WHEREFORE,** Plaintiff demands judgment against John Sogliuzzo for damages; punitive damages; attorney's fees and expenses; interest; costs of suit; and such other and further relief as this Court deems just.

## TWENTY-NINTH COUNT

## NEGLIGENCE

## ALLOWING MISAPPROPRIATIONS BY FIDUCIARY AGAINST
## TD BANK FROM CHECKING & SAVINGS ACCOUNTS

374.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 373 of the Complaint as if set forth herein at length.

375.    Hudson Bank n/k/a TD Bank was the bank where Jane Sogliuzzo did her banking.

376.    Hudson Bank should have had a Power of Attorney or signature card on file for John B. Sogliuzzo on each of Jane Sogliuzzo's accounts, but did not do so.

377.    John Sogliuzzo did not have a Power of Attorney for Jane Sogliuzzo until November 2006 and TD Bank never kept one on file.

378.    Prior to John Sogliuzzo receiving a Power of Attorney for his mother, John wrote checks to himself and endorsed the checks in his own handwriting, and continued this same practice after the Power of Attorney.

379.    Hudson Bank cashed the checks even though they knew that the signature did not match the one they had on file.  TD Bank (Hudson Bank) also allowed John B. Sogliuzzo to make numerous withdrawals and transfers from Jane P. Sogliuzzo's savings accounts without verifying that he was authorized to do so.

380.    The actions of Hudson Bank n/k/a TD Bank in failing to take the proper safeguards in this situation allowed John Sogliuzzo to commit forgery and conversion, and they do not rise to the standard of care owed to its depositors for a banking institution.

**WHEREFORE,** Plaintiffs demand judgment against TD Bank for negligence, awarding

damages; attorney's fees and expenses; interest; costs of court and such other and further relief as is just in the circumstances.

## THIRTIETH COUNT

### GROSS NEGLIGENCE AGAINST TD BANK

381.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 380 of the Complaint as if set forth herein at length.

382.    Jane P. Sogliuzzo had three (3) signature cards on file with TD Bank.

383.    Each of the signature cards were executed in 1999; after John Sogliuzzo took over his mother's finances.  The first dated March 10, 1999; the second April 5, 1999; and the third June 1, 1999.

384.    TD Bank had no Power of Attorney on file for John Sogliuzzo.

385.    TD Bank cashed checks and cleared checks with forged signatures for John Sogliuzzo on his mother's account without verifying the signature; without checking for identification; without asking for a Power of Attorney.

386.    The actions of TD Bank as aforesaid constitute gross negligence.

387.    As a result of TD Bank's gross negligence the Plaintiff has been damaged.

**WHEREFORE,** Plaintiffs demand judgment against TD Bank for negligence, awarding damages; punitive damages; attorney's fees and expenses; interest; costs of court and such other and further relief as is just in the circumstances.

## THIRTY-FIRST COUNT

### BREACH OF FIDUCIARY DUTIES AGAINST TD BANK

388.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 387 of the Complaint as if set forth herein at length.

389.   As a customer of TD Bank, TD Bank owed a fiduciary duty to Jane D. Sogliuzzo.

390.   TD Bank violated its fiduciary duty to Jane P. Sogliuzzo by allowing John B. Sogliuzzo to use an unauthorized signature, to endorse fraudulent instruments, and to make unauthorized withdrawals and inter-account transfers, all without a Power of Attorney from Jane P. Sogliuzzo.

391.   As a result of TD Bank's breach of fiduciary duty, Plaintiff has been damaged.

**WHEREFORE,** Plaintiffs demand judgment against TD Bank for negligence, awarding damages; attorney's fees and expenses; interest; costs of court and such other and further relief as is just in the circumstances.

## THIRTY-SECOND COUNT

## BREACH OF FIDUCIARY DUTY AGAINST
## TOM RODMAN AND ALEX BROWN

392.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 391 of the Complaint as if set forth herein at length.

393.   Because she was an account holder of Alex Brown and Tom Rodman was her financial advisor, each owed a fiduciary duty including a duty of loyalty to Jane P. Sogliuzzo.

394.   Tom Rodman and Alex Brown also held accounts for the benefit of Defendants, John B. Sogliuzzo and Gaye Torrance and their children.

395.   The acts of Tom Rodman as aforesaid and consequently Alex Brown violated that fiduciary duty to Jane P. Sogliuzzo.

396.   As a consequence, Tom Rodman and Alex Brown's breach of fiduciary duty, Plaintiff has been damaged.

**WHEREFORE,** Plaintiffs demand judgment against Tom Rodman and Alex Brown for breach of fiduciary duty, awarding damages; attorney's fees and expenses; interest; costs of court

and such other and further relief as is just in the circumstances.

## THIRTY-THIRD COUNT

### UNDUE INFLUENCE ON MARY'S INTERVIVOS TRANSFERS

397.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 396 of the Complaint as if set forth herein at length.

398.    The intervivos transfers made from Mary's accounts to John Sogliuzzo and/or Gaye Torrance for the benefit of himself or his family were the result of undue influence.

399.    As a result of his undue influence upon Mary Grimley, the Plaintiffs have been damaged.

**WHEREFORE,** Plaintiffs demand judgment against Defendants John Sogliuzzo and Gaye Torrance for undue influence, awarding damages; attorney's fees and expenses; interest; costs of court and such other and further relief as is just in the circumstances.

## THIRTY-FOURTH COUNT

### NEGLIGENCE

### ALLOWING MISAPPROPRIATIONS BY FIDUCIARY AGAINST HAVEN SAVINGS BANK FROM CHECKING & SAVINGS ACCOUNTS

400.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 399 of the Complaint as if set forth herein at length.

401.    Haven Savings Bank was the bank where Mary Grimley did most of her banking.

402.    Haven Savings Bank knew Mary Grimley as well as, her saving and spending habits based upon years of its experience with her

403.    Haven Savings Bank and its personnel were well aware of Mary Grimley's age and deteriorating physical and mental condition both before and after an alleged power of

attorney was tendered to them by John Sogliuzzo for his benefit. That power of attorney was not signed by Mary T. Grimley in the presence of the notary. John Sogliuzzo's secretary notarized it upon his instruction.

404.    The checks for cash that John Sogliuzzo tendered to Haven Savings Bank after he secured the alleged power of attorney were uncharacteristically large and beyond those required for Mary Grimley's living expenses and care.

405. The checks that John Sogliuzzo tendered to Haven Savings Bank written to himself; his law firm and his wife were uncharacteristic and extremely large. These withdrawals should have been evident to Haven Savings Bank that they were at best intervivos transfers which by operation of law were the result of undue influence by a person or persons with a confidential relationship.

406. The cashing in of Mary Grimley's savings bonds and those that her brothers had left her in the amount of $250,000-$260,000 by John Sogliuzzo (which started in 2002) was uncharacteristic of Mary Grimley who never cashed in savings bonds. The systematic cashing of these savings bonds by John Sogliuzzo combined with his regular practice of withholding large sums of cash from these redemptions should have alerted  Haven Savings Bank  to the nature  of his  unlawful actions.

407. John Sogliuzzo activities with respect to Mary's savings accounts were similar in nature and magnitude to his actions concerning of her savings bonds. It was uncharacteristic for Mary to withdraw the principal from a savings account. She would live on the interest The systematic depletion of Mary Grimley's financial assets and the taking of large quantities of cash by John Sogliuzzo were  uncharacteristic of Mary Grimley's spending habits and far in excess of what was needed to support her.

408.    Haven Savings Bank repeatedly turned a blind eye to the numerous activities of John B. Sogliuzzo relying on an invalid power of attorney. Even with a valid power of attorney at best, his activities would constitute undue influence .

409.    Haven Savings Bank failed to exercise a reasonable standard of  take the proper safeguards to prevent the systematic decimation of Mary Grimley's  assets that she and her family had accumulated over two generations.. Any objective observer would have recognized and investigated John Sogliuzzo's actions considering their knowledge and familiarity with Ms.. Grimley and the propensity for elder abuse under a power of attorney.

410. Haven Savings Bank failed to act reasonably under the circumstances and their actions or lack thereof did not rise to the duty of care owed to its depositors for a banking institution.  As a result of Haven Savings Bank's negligence John Sogliuzzo was able to make almost $500,000 in intervivos transfers to his, his firm and his wife's benefit.

411. Further, the writing of disproportionately large checks on the Estate Account of another approximately $200,00 to himself and his law firm should have further alerted  Haven Saving Bank of John Sogliuzzo's improper and illegal activities..

**WHEREFORE,** Plaintiffs demand judgment against Haven Savings Bank for negligence, awarding damages; attorney's fees and expenses; interest; costs of court and such other and further relief as is just in the circumstances.

## THIRTY FIFTH COUNT

## GROSS NEGLIGENCE AGAINST HAVEN SAVINGS BANK

412.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 411 of the Complaint as if set forth herein at length.

413.    Mary T. Grimley banked at Haven Savings Bank for years.

414. Until her health was failing in 2002, Mary T. Grimley would personally walk to the Haven Savings Bank on a regular basis.

415. Haven Savings Bank knew Mary and her spending and her savings habits. The Bank observed her "conserve the principal" mentality and John Sogliuzzo's pattern of raiding the principal, cashing in savings bonds, cashing checks and writing huge sums of money to himself his law practice and his wife were so contrary to Mary's habits witnessed by the bank over years that it should have alerted Haven Savings Bank to the unlawful activities he was perpetrating.

416.    At a minimum the intervivos transfers to a person with a confidential relationship with Mary as evidenced by his transacting her banking business and the existence of an alleged power of attorney, constituted an undue influence transfer which would later call Haven Savings Bank's actions into question.

417.    The failure to take proper actions to safeguard Mary Grimley's accounts at Haven Savings Bank along with their unquestioning willingness to redeem her family savings bonds constitutes gross negligence.

418.    As a result of Haven Savings Bank gross negligence the Plaintiff has been damaged.

**WHEREFORE,** Plaintiffs demand judgment against Haven Savings Bank for gross negligence, awarding damages; punitive damages; attorney's fees and expenses; interest; costs of court and such other and further relief as is just in the circumstances.

## THIRTY-SIXTH COUNT

### BREACH OF FIDUCIARY DUTIES AGAINST HAVEN SAVINGS BANK

419.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 418 of the Complaint as if set forth herein at length.

420.   As a customer of Haven Savings Bank, Haven Savings Bank owed a fiduciary duty to Mary T. Grimley.

421.   Haven Savings Bank violated its fiduciary duty to Mary T. Grimley by allowing John B. Sogliuzzo to raid her accounts, cash large and uncharacteristic checks to cash, negotiate large checks to himself, his firm and his wife, cashing in savings bonds that had been held for decades. By failing to act Haven Savings Bank allowed John Sogliuzzo to decimate the life savings of a sick, frail and elderly patron who they had known for years, both before and after the presentation of an alleged Power of Attorney which had never been properly witnessed or notarized.

422.   As a result of Haven Savings Bank's breach of fiduciary duty, Plaintiff has been damaged.

**WHEREFORE,** Plaintiffs demand judgment against Haven Savings Bank for breach of fiduciary duty, awarding damages; attorney's fees and expenses; interest; costs of court and such other and further relief as is just in the circumstances.

## CERTIFICATION PURSUANT TO L. Civ. R. 11.2

I hereby certify that except for the following, the matters in controversy are not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding: In The Matter of the Estate of Jane P. Sogliuzzo, Superior Court of New Jersey, Chancery Division, Probate Part, Hudson County, Docket No. 296580 and In the Matter of the Estate of Mary T.

Grimley, Superior Court of New Jersey, Chancery Division, Probate Part, Hudson County.

By:   s/Dennis F. Gleason
       Dennis F. Gleason

       CARELLA, BYRNE, CECCHI, OLSTEIN,
       BRODY & AGNELLO
       5 Becker Farm Road
       Roseland, New Jersey 07068
       (973) 994-1700

       Attorneys for Plaintiff
       Jane E. Adkins

Dated:  January 13, 2012

390207v4