**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

JANE E. ADKINS,

      Plaintiff,

v.

JOHN B. SOGLIUZZO, *et al.*,

      Defendants.

Civil Action No. 09-1123 (SDW)

---

**MEMORANDUM OF LAW ON BEHALF OF JANE ADKINS IN
SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOHN SOGLIUZZO**

---

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Attorneys for Plaintiff
Jane E. Adkins

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

A.   Jane Sogliuzzo ............................................................................................ 2

B.   Mary Grimley............................................................................................. 10

    1.   Conversions by John Sogliuzzo from Mary Grimley 1999 to her death in 2006 ..... 12

    2.   Following Mary Grimley's Death ........................................................... 13

C.   Fr. Gerry.................................................................................................... 13

D.   Jane Adkins................................................................................................ 14

E.   John Sogliuzzo ........................................................................................... 15

ARGUMENT ...................................................................................................... 15

    POINT I .................................................................................................... 15

    BASED ON THE EXTENDED AND OUTRAGIOUS CONDUCT OF JOHN
    SOGLIUZZO, THE COURT SHOULD GRANT SUMMARY JUDGEMENT IN
    FAVOR OF JANE ADKINS AS TO INTENTIONAL INFLICTION OF EMOTIONAL
    DISTRESS ................................................................................................ 15

A.   Standard For Summary Judgment................................................................ 16

B.   Based On The Intentional Conduct Of John Sogliuzzo, Jane Adkins Has Suffered
    Emotional Distress ...................................................................................... 17

    1.   The Acts Of John Sogliuzzo Were Intentional ......................................... 18

    2.   The Conduct Of John Sogliuzzo Was Extreme And Outrageous.............. 19

    3.   The Conduct Of John Sogliuzzo Is The Proximate Cause Of The Emotional
        Distress Of Jane Adkins.......................................................................... 20

    4.   The Emotional Distress Suffered By Jane Adkins On Account Of The Conduct Of
        John Sogliuzzo Is Severe ......................................................................... 21

CONCLUSION.................................................................................................... 23

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...................................................................................................16

*Baxter v. Palmigiano,*
425 US. 308 (1976) ...................................................................................................17

*Buckley v. Trenton Savings Fund Society,*
111 N.J. 355 (1988) ...................................................................................................17

*Celotex Corp. v. Carroll,*
477 U.S. 317 (1986) ...................................................................................................16

*Matsushita Sec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ...................................................................................................16

*Moore U.S.A., Inc v. Standard Register Co.,*
229 F.3d 1091 (Fed. Cir. 2000) ...................................................................................16

*TechSearch, L.L.C. v. Intel Corp.,*
286 F.2d 1380 (Fed. Cir. 2002) ...................................................................................16

*Zamboni v. Stamler,*
847 F.2 73  (3d Cir. 1988) ...........................................................................................17

OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ...................................................................................................16

Fifth Amendment ...................................................................................9, 15, 17, 19, 20

## PRELIMINARY STATEMENT

Plaintiff Jane E. Adkins ("Adkins") moves for partial summary judgment against John Sogliuzzo as to the Seventh Count: intentional infliction of emotional distress. If the motion is granted as to liability, Jane Adkins will leave for trial the amount of damages to be awarded.

The uncontested evidence shows that in early 2008, after the death of Jane Sogliuzzo the mother of Jane Adkins and John, Jane Adkins came to learn that her brother John had misappropriated and converted virtually all of the savings that had been accumulated by their mother. In her investigation of Jane Sogliuzzo's finances, Jane Adkins also uncovered that John had perpetrated a similar scheme, stealing more than $400,000 from Mary Grimley, an elderly cousin of Jane Adkins and John. When confronted by Jane Adkins, John denied any wrongdoing and then engaged in a campaign of verbal and emotional abuse of his sister as she sought to recover from John what he had taken.

As a result of John's conduct, Jane Adkins has suffered from repeated seizures and anxiety attacks which have multiplied since 2008 causing her severe emotional distress. All of this is directly linked to the actions of John.

1

## STATEMENT OF FACTS

### A. Jane Sogliuzzo

John Sogliuzzo and Jane Adkins are son and daughter to Jane P. Sogliuzzo.

At the time of her death, Jane Sogliuzzo was a widow, her husband Walter J. Sogliuzzo having died in January 1999. (Declaration of Dennis F. Gleason dated January 4, 2013 ("Jan. 4 Gleason Decl.") Exhibit A at 4:7-17; Exhibit B at 5:21-23.)

Prior to his death, Walter Sogliuzzo suffered from various ailments including Parkinson's disease and depression. As a result of his poor health, Walter was no longer able to manage the family financial matters as he had in the past. (*Id.*, Exhibit A at 47:11-48:13; Exhibit B at 5:24-6:14.)

John Sogliuzzo, an attorney admitted to practice in New Jersey, took control of the finances of Jane and Walter in 1998. After Walter's death, John Sogliuzzo assumed responsibility for Jane's financial matters, as she had little or no experience in that area. (*Id.*, Exhibit C at 2:25-3:15; Exhibit A at 4:10-12 and 56:21-57:16; Exhibit B at 6:15-7:13.)

At John's direction, Jane Sogliuzzo closed various bank accounts that she held jointly with Walter and opened new bank accounts in her name. (*Id.,* Exhibit C at 3:13-18; Exhibit B at 7:8-17.)

In addition, at John's direction, Jane Sogliuzzo opened an investment account at Deutsche Bank Alex. Brown ("DB Alex Brown"). *(Id.,* Exhibit C at 3:16-23; Exhibit A at 5:14-20.)

John Sogliuzzo was named as the only other person who had authority to approve stock trades on behalf of Jane Sogliuzzo. Here again Jane placed her trust in John to handle her investments observing that she hoped that John knew what he was doing. (*Id.,* Exhibit B at 8:1-6.)

2

With regard to her checking account, while Jane Sogliuzzo would occasionally sign a check, she left it to her son John to handle her money and pay her bills. (*Id.*, Exhibit C at 3:24-4:6.)

John would generally, on each Friday, go to his mother's home and write checks for the bills received signing his mother's name in most instances. (*Id.,* Exhibit A at 4:18-5:9; Exhibit B at 7:3-25.)

Jane Sogliuzzo did not make deposits or withdrawals at her bank; rather that was all handled by John.  (*Id.*, Exhibit B at 6:21–7:7 and 40:6-41:1.)

Jane Sogliuzzo lived a frugal lifestyle both before and after the death of Walter.  The largest expense Jane made after Walter's death was a washing machine. (*Id.,* Exhibit B at 8:22-25.)  Each month she received her Social Security and pension benefits which was used for most of her living expenses.  (*Id.*, Exhibit B at 8:7-25 and 41:20-25.)

When Jane provided gifts to her children and grandchildren, such as birthdays and special occasions, the gifts were generally of modest amounts, about $50 and by check. (*Id.*, Exhibit C at 4:16-22.)

Except for purchasing groceries, virtually all of Jane's expenses were paid by check or credit card. (*Id.*, Exhibit C at 4:7-15; Exhibit B at 13:21-14:4.)

Beginning 2000, Jane Sogliuzzo faced a heightened series of health issues.  First there was an accident where she severely injured her right shoulder.  (*Id.,* Exhibit C at 5:1-13; Exhibit A at 32:2-15.)  During that time she was unable to sign any documents, for all intents and purposes.  This episode also resulted in Jane remaining on the first floor of the brownstone she owned in Hoboken.  Rather than retire each night to her second floor bedroom, Jane slept on a recliner chair on the first floor from 2000 until she died in February 2008. (*Id.,* Exhibit

B at 15:3-11 and 18:10-16.)

After 2000, Jane's issues with her back excerbated her Chronic Obstructive Pulmonary Disease ("COPD") problems. Her breathing became more difficult, requiring her to use multiple inhalers. (*Id.,* Exhibit C at 5:5-13; Exhibit A at 43:8-14.)

Jane's problems with her eyes likewise deteriorated over time. She had been diagnosed with glaucoma and cataracts and had had surgery on both eyes resulting in very poor vision. By 2005 she was forced to regularly apply eye drops to help reduce the ongoing stinging. Her eyesight was so bad that sometimes she would confuse objects with people. (*Id.,* Exhibit A at 54:10-56:10; Exhibit B at 15:12-22 and 17:18-18:9.)

In the months leading up to her death, Jane was observed as having lost interest in many of the little things she liked to do such as crossword puzzles. She ignored mail, refusing to open or read it. (*Id.,* Exhibit B at 15:19-22 and 66:8-18.)

In the fall of 2007, about four months before her death, John Sogliuzzo arranged for an October 17 meeting at a Hoboken restaurant between Jane Sogliuzzo and H. Thompson Rodman of DB Alex Brown where Jane had her investment account. (*Id.,* Exhibit D at 69-71.)

The meeting was unusual given Rodman's limited interest in Jane's investment account in the preceding years. From the time that the DB Alex Brown account was opened in 1999 to October 2008, Jane Sogliuzzo had, at best, five conversations with Rodman, the lead person responsible for the account. (*Id.,* Exhibit D at tr. 75-76.) The October 17 meeting was also unusual because it took place a couple of weeks after Jane Sogliuzzo had been released from the hospital for treatment of her inability to breathe, her ongoing issues with COPD and problems with her spine. (*Id.,* Exhibit B at 23:9-24 and 25:4-10.)

4

Rodman, whose office was in New York City, travelled by ferry to Hoboken and was picked up by John who drove Rodman and Jane Sogliuzzo to the restaurant. (*Id.*, Exhibit D at tr. 68.)

John was careful to schedule the meeting with Rodman between the visits to New Jersey by Jane Adkins to visit her mother (approximately every ten days) so that Jane Adkins would not learn of the meeting. (*Id.*, Exhibit B at 17:8-17; Exhibit C at 9:20-25.)

During the meeting, Rodman filled in a preprinted form and provided Jane Sogliuzzo with several documents to sign, including a handwritten document he prepared at the restaurant. (*Id.*, Exhibit D at tr. 45-46; 78-79.)

Among the documents presented for Jane Sogliuzzo's signature was the establishment of a transfer on death ("TOD") account naming John Sogliuzzo as the sole primary beneficiary. (*Id.*)

It is very unlikely that Jane Sogliuzzo could have read the document especially with the small typeface. (*Id.*, Exhibit B at 21:16-20 and 22:5-19.) Indeed, around that same time, Jane Sogliuzzo could not read a restaurant menu; it had to be read to her. (*Id.*, Exhibit B at 26:14-23.)

Of the approximately ten TOD agreements that Rodman had prepared over the years, the Jane Sogliuzzo TOD was the only one that had ever been executed in any location but Rodman's office. In Rodman's own words: "It's fair to say this was an exception, yeah." (*Id.*, Exhibit D at tr. 102-03.)

The establishment of a TOD account with John as the only beneficiary, moreover, did not square with Jane's intentions in her will which called for the equal division of her estate to her children.

In late 2007 and early 2008 Jane Sogliuzzo's health continued to deteriorate. She was unable to leave her home without assistance; her breathing problems increased; her eyesight continued to diminish to a point where it was difficult for her to identify even family members.

Jane Sogliuzzo died February 29, 2008 at the age of 93. (*Id.,* Exhibit C at 5:14-15.)

Jane executed a will dated November 20, 2002. The will appointed the Rev. W. Gerard Sogliuzzo ("Fr. Gerry") and John Sogliuzzo as co-executors. The will also provided that after expenses for her estate, Jane Sogliuzzo's three children would share equally as beneficiaries, except for some special considerations given to her son, Fr. Gerry, a Roman Catholic priest with limited resources. Jane Sogliuzzo provided that the brownstone she owned and at which she resided at 1228 Bloomfield Street in Hoboken would be divided 40 percent to Fr. Gerry, and 30 percent each to John Sogliuzzo and Jane Adkins. (*Id.,* Exhibit G.) Otherwise, the will shows that Jane treated all of her children equally. (*Id.,* Exhibit C at 5:16-24.)

Jane Adkins and John Sogliuzzo were the two surviving children of Jane Sogliuzzo, Fr. Gerry having died in October 2003. (*Id.,* Exhibit C at 5:25-6:2.) John Sogliuzzo became the sole executor.

Because Fr. Gerry predeceased Jane Sogliuzzo, her will provided that each of the surviving children (Jane Adkins and John) were to be 50 percent beneficiaries after estate expenses.

Jane Sogliuzzo's will was probated by John Sogliuzzo March 13, 2008. At the time, the only substantial asset of the estate was the Hoboken brownstone owned by Jane Sogliuzzo.

Shortly after the death of their mother, Jane Adkins asked her brother John about the assets of their mother. (*Id.,* Exhibit B at 27:4–27:24.) At the time of her death, there was only approximately $14,000 in Jane Sogliuzzo's bank accounts because of the extensive conversions

by John Sogliuzzo.  John advised his sister that there was virtually nothing in the way of liquid assets. (*Id*., Exhibit B at 27:12-19.)

Even though John was fully aware of creation of the TOD account, it was not until Jane asked about their mother's assets that John first told his sister that their mother had changed the DB Alex Brown investment account to a TOD account with John as the single primary beneficiary.  During this conversation, John lied to his sister by telling her that the TOD account had been established in late 2006.  (*Id.,* Exhibit B at 27:9–28:14.)  This was intended to deliberately misinform Jane Adkins into believing that the TOD account was set up when Jane Sogliuzzo was in better health.

As Jane Adkins inquired more of John about the details of the finances of their mother, John became uncooperative finally telling his sister: "If you have any problems, sue me for undue influence." (*Id.,* Exhibit B at 29:19-30:13.)

John Sogliuzzo, shortly thereafter, referred all inquiries to his attorney.

Following her exchange with John regarding their mother's assets, Jane grew suspicious of how John had maintained their mother's finances.  In the days following her mother's death, Jane Adkins examined some of the banking records found in their mother's Bloomfield Street brownstone which disclosed, among other things, that checks in large amounts had been made payable to John and that there were numerous checks made payable to cash.  (*Id.*, Exhibit B at 35:6-24 and 37:6-25.)  In the view of Jane Adkins, this raised additional suspicions as to how John had handled Jane Sogliuzzo's banking matters.  The questionable checks and John's lack of candor regarding the finances of Jane Sogliuzzo prompted Jane Adkins to delve further.

Later, financial documents in the home of Jane Sogliuzzo were discovered missing by Jane Adkins.  (*Id.,* Exhibit B at 43:9-44:23.)

Because she did not have experience in these matters, Jane looked to her husband Charles who is one of the principals in Adkins & Co., a consulting company which as part of its business engaged in forensic accounting and fraud investigations.

A short time later, Jane Adkins retained legal counsel, who in turn retained Adkins & Co. to assist in the investigation of the financial affairs of Jane Sogliuzzo and how they were handled by John.

In the following months, under the supervision of counsel, Adkins & Co. identified, collected, reviewed and analyzed thousands of pages of banking records and other financial material of Jane Sogliuzzo.  Based on this initial review there was a factual basis for Jane Adkins to have John removed as executor.

John Sogliuzzo renounced his duties as executor in response to an Order to Show Cause, dated July 20, 2008.  In his place, by Order dated August 22, 2008, Jane Adkins was appointed Executrix.

Through the authority as Executrix, her counsel with the assistance of Adkins & Co. was able to obtain additional banking documents which had not been available or had not been provided by John Sogliuzzo.

In September 2008, based on the investigation by Adkins & Co. of John Sogliuzzo's conversions, Jane Adkins as Executrix brought suit against her brother in New Jersey Superior Court, Chancery Division, Probate Part alleging that he had exercised undue influence over their mother.  It was alleged, among other things, that John Sogliuzzo, without authority, signed his mother's name to checks made payable to John Sogliuzzo and his law practice; that John made multiple large withdrawals of cash from the savings accounts of his mother, again without authority (*Id.,* Exhibit B at 37:13-41:19); and that John Sogliuzzo was instrumental in having his

then 92 year old mother, four months before her death, change her almost $300,000 investment account at DB Alex Brown to a TOD account with John Sogliuzzo as the sole beneficiary, which was contrary to the intentions of the will of Jane Sogliuzzo.

When the Executrix had demonstrated the preliminary elements of undue influence in the Probate Part action, i.e., a confidential relationship and suspicious activities, the burden of proof under New Jersey Law shifted to John Sogliuzzo to demonstrate no undue influence.  But on account of his blanket invocation of the Fifth Amendment, John Sogliuzzo refused to come forward with such evidence as he was required to do.  Accordingly, viewing John Sogliuzzo as the functional equivalent of a plaintiff who invokes the Fifth Amendment, the Probate Part court struck John Sogliuzzo's answer and affirmative defenses for refusing to provide discovery on his burden of proof.  The Probate Part court further ruled that at a proof hearing John Sogliuzzo would only be allowed to cross examine witnesses that might be called by the Executrix; he could not present any evidence. (*Id.*, Exhibit C at 2:14-25.)  A default was then entered.

At the conclusion of the hearing,  the trial court found that the Executrix had presented a *prima facie* case that John Sogliuzzo had exerted undue influence over his mother. (*Id.,* Exhibit C at 7:3-8:22.)  The trial court then awarded:

- $192,168 for misappropriation of the DB Alex Brown investment account that was converted to a TOD account with John Sogliuzzo as the sole beneficiary. (*Id.*, Exhibit C at 11:17-11:22.)

- $133,551 for unauthorized checks payable to John Sogliuzzo and his law practice. (*Id.*, Exhibit C at 11:23-13:5.)

- $14,401 for unauthorized checks payable to the Pingry School to pay private school tuition for John's children. (*Id.,* Exhibit C at 13:6-19.)

- $61,150 for the unauthorized withdrawals from the savings accounts of Jane Sogliuzzo by John Sogliuzzo. (*Id.*, Exhibit C at 18:4-9.)

## B. Mary Grimley

Mary Grimley grew up in Hoboken, New Jersey in "a cold water flat" with her parents and older brothers.

Mary never married. As the only daughter in an Irish family, she felt a great devotion to family. She remained in the same apartment that she was raised and cared for her parents as they became older, and then later her two bachelor brothers, James and Joseph, until each of their deaths. (*Id.*, Exhibit J at tr. 131.)

Mary's family lived through the Great Depression. Like most in that generation, they lived very frugally, skimping and saving and putting away whatever monies they could in United States Savings Bonds. (*Id.*, Exhibit I at ¶¶ 10-11; Exhibit H at tr. 1309-12.)

As Mary had no sisters of her own she was very close to her cousin, Jane Sogliuzzo. Jane Sogliuzzo's mother and Mary's mother were sisters.

Jane Sogliuzzo lived with her family in Hoboken a few blocks away from Mary. Jane Sogliuzzo was just two months younger than Mary and because of their proximity in age, their relationship was very close.

Mary valued her independence. However, because she had no young family of her own, was very close to Jane Sogliuzzo's family.

As the years passed, Mary first lost her parents, then her brothers, then her cousin, Kathleen. She remained close to Jane and Walter Sogliuzzo. Other than her friend, Millie Braun, and the church, the Sogliuzzo's remained Mary's closest family.

Jane Adkins was Mary's god daughter and to Mary that was a very special and sacred relationship. Mary never made it a secret that Jane Adkins was her favorite cousin.

10

While Jane Adkins lived out of state, the relationship between Jane Adkins and Mary never waned.  Mary made several overnight trips to the Adkins' homes.  The Adkins and their children were frequent visitors to Mary Grimley.  (*Id.*, Exhibit H at tr. 1300-02.)

Although she was increasingly becoming less mobile, Mary continued to hold on to her independence and walked to mass daily until September 2002.  (*Id.*, Exhibit J at tr. 138.)

Although Mary's physical condition continued to decline she was reluctant to go to any doctor.

By the summer of 2002, Mary's physical and mental health had deteriorated to the point at which she could no longer live alone and she finally and reluctantly acknowledged it.  The family finally convinced Mary that she should move in with Jane Sogliuzzo.  (*Id.*, Exhibit J at tr. 124-25.)

Mary had never wanted anyone to know her financial business.  She had been careful all her life not to let anyone know about her finances.  Even with her failing faculties and physical ailments, Mary remained a proud and independent woman who resisted disclosing her financial matters to anyone including members of her family.

John Sogliuzzo stopped by the Hoboken house once a week usually on Friday afternoons to do the banking for Jane. Sogliuzzo and Mary.  (*Id.*, Exhibit I at ¶9.)

John Sogliuzzo would write out checks for Jane Sogliuzzo's bills and then go upstairs to Mary's apartment for the same purpose.

Mary's physical and mental conditions continued to deteriorate from 2004 until her death in 2006.  During her last year of life, her dementia was so prevalent that she did not recognize very many people  (*Id.* Exhibit H at tr. 1229-30; 1305-07.)  She also required a hospital bed to

11

keep her from falling out of bed.  During the last few weeks of her life, Mary was under the care of Hospice.

Mary died on October 16, 2006, at the age of 91.

### 1.   Conversions by John Sogliuzzo from Mary Grimley 1999 to her death in 2006

In the course of reviewing records of Jane Sogliuzzo, it became apparent that John Sogliuzzo had engaged in a corresponding scheme to misappropriate funds from Mary Grimley, an elderly cousin of Jane Adkins and John Sogliuzzo.

The evidence shows that John Sogliuzzo, without authorization, converted more than $400,000 of funds belonging to Mary Grimley for the period 2002 through 2006.  (*Id.*, Exhibit I at ¶25 and 29.)

John accomplished this in part by redeeming, without authorization, hundreds of thousands of dollars of U.S. Savings Bonds belonging to Mary Grimley and then keeping a portion of the redemption and depositing the balance in various bank accounts of Mary Grimley, to be withdrawn in the future for his personal use.

The Probate Part court which removed John in September 2011 as executor of the Grimley estate based on evidence of self dealing, found that John had written checks to himself and one check to his law practice, totaling in excess of $155,000[1].(*Id.*, Exhibit E at tr. 3.)

In addition, the Probate Part judge pointed to evidence that John Sogliuzzo's wife received $41,000 as *inter vivos* transfers, when no other family members had received such sums.  (*Id.*, Exhibit E at tr. 6.)

---

[1] The facts stated are findings of the Probate Part Court which findings John Sogliuzzo has not timely challenged.

The court further noted that there was evidence that between August 2004 and 2006, John Sogliuzzo made cash withdrawals from the Grimley account in excess of $15,000. (*Id.*, Exhibit E at tr. 6.)

### 2.   Following Mary Grimley's Death

At the time of Mary Grimley's death in 2006, the two surviving co-executors were Jane Sogliuzzo and John Sogliuzzo. As part of his overarching scheme to cover up his years of conversion of Mary's assets, John convinced his mother to allow him to be the sole executor.

John was removed by the Probate Part judge in September 2011 after it was proven that John had engaged in multiple acts of fraud. The Probate Part court observed that there were five surviving beneficiaries named in Mary's will. Jane Sogliuzzo, Jane Adkins and John Sogliuzzo were each to receive 23.8 percent of the estate; Melitta Braun and Our Lady of Grace Catholic Church were to each receive 14.3 percent of the estate. (*Id.*, Exhibit E at 3-4.)

In removing John, the court found, among other things, that John had improperly enriched himself when he did not make distributions pursuant to the terms of the will. John, in fact, paid himself nearly 63 percent of the estate while he gave his mother two percent, Jane Adkins, Ms. Braun and Our Lady of Grace Church about 11.6 percent each. (*Id.*, Exhibit E at tr. 5.)

Additionally, the court found that John had prepared a false estate income tax return when he declared paid funeral expenses of $15,070 while the only check shows payment of $3,600. (*Id.*, Exhibit E at tr. 6.)

Although required to do so, John never filed a formal accounting of estate.

### C.   Fr. Gerry

As a priest with the Archdiocese of Newark, Fr. Gerry was provided with a meager life insurance policy. Fr. Gerry had named his mother as the sole beneficiary. (*Id.*, Exhibit L.)

A review of available documents after the death of Jane Sogliuzzo, disclosed that while Fr. Gerry was alive, John Sogliuzzo forged the signature of Fr. Gerry and removed his mother has the sole beneficiary of a modest life insurance policy and John substituted himself as the single beneficiary. (*Id.*, Exhibit L.)

The discovery by Jane Adkins that her brother John would stoop so low as to forge the signature of their sibling, a Roman Catholic priest, so that John could further enrich himself was yet another event that triggered Jane to become upset.

**D. Jane Adkins**

In December 2003, Jane Adkins underwent surgery to remove a benign brain tumor which John Sogliuzzo was aware of. (*Id.*, Exhibit H at tr. 9.)

In early 2008, following the death of her mother and in connection with discovery that her brother had converted and misappropriated hundreds of thousands of dollars from Jane Sogliuzzo and Mary Grimley, Jane began to was subject to a significant number of seizures and anxiety attacks. (*Id.*, Exhibit H at tr. 21.)

The seizures and anxiety attacks are a direct result of Jane learning what John had done, his denial of conversion and misappropriation of money belonging to their mother and cousin Mary Grimley, and John's abuse tactics to Jane since the revelations. (*Id.*, Exhibit H at tr. 34.)

The severity of the stress on Jane was so extreme in one instance, following a meeting between John and his attorney regarding what John had done, Jane was hospitalized for two days in July 2008. (*Id.,* Exhibit H at tr. 27-28.)

Many of the seizures and anxiety attacks were recorded by Jane Adkins when they occurred. (*Id.*, Exhibit F.)

### E. John Sogliuzzo

John Sogliuzzo has asserted a blanket invocation of the Fifth Amendment as to all issues in this action. This would include providing any responses to interrogatories and requests to produce documents served on him by the Jane Adkins in this matter. Additionally, John Sogliuzzo has invoked his Fifth Amendment privilege with regard to all questions posed to him at deposition.

John Sogliuzzo has asserted similar blanket invocations of the Fifth Amendment in the following proceedings: (1) *In the Matter of the Estate of Jane P. Sogliuzzo*, New Jersey Superior Court, Hudson County, Chancery Division, Probate Part, Docket No. 296580; (2) *In the Matter of the Estate Mary T. Grimley,* New Jersey Superior Court, Hudson County, Chancery Division, Probate Part, Docket No. 293746; and (3) *Office of Attorney Ethics v. John B. Sogliuzzo,* Docket No. XIV 2009-0144E.

## ARGUMENT

## POINT I

## BASED ON THE EXTENDED AND OUTRAGIOUS CONDUCT OF JOHN SOGLIUZZO, THE COURT SHOULD GRANT SUMMARY JUDGEMENT IN FAVOR OF JANE ADKINS AS TO INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Seventh Count alleges, in essence, that John Sogliuzzo, with the full knowledge of Jane Adkins' health following the removal of a brain tumor, intentionally caused severe emotional distress to his sister by conceiving and carrying out a scheme to steal and or misappropriate hundreds of thousands of dollars from their mother Jane Sogliuzzo and cousin Mary Grimley, later denying any wrongdoing, concealing the truth and then accusing Jane Adkins of being a "money grubber" when the unfiltered facts revealed the scope of John's misdeeds.

## A. Standard For Summary Judgment

Under Fed. R. Civ. P. 56(c), the moving party is entitled to summary judgment "if the pleadings [and discovery] on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See also, *Celotex Corp. v. Carroll,* 477 U.S. 317, 322 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a factfinder could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[A] genuine dispute requires more than a metaphysical doubt; there must be an issue for trial." *Matsushita Sec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The movant's burden may be discharged by demonstrating to the district court that there is an absence of sufficient evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325. The non-moving party must come forward with evidence sufficient to support a verdict in its favor. *Anderson,* 477 U.S. at 249. "A party may not overcome a grant of summary judgment by merely offering conclusory statements." *Moore U.S.A., Inc v. Standard Register Co.,* 229 F.3d 1091, 1112 (Fed. Cir. 2000). "[G]eneral assertions of facts, general denials, and conclusory statements are insufficient to shoulder the nonmovant's burden." *TechSearch, L.L.C. v. Intel Corp.,* 286 F.2d 1380, 1372 (Fed. Cir. 2002), (citation omitted).

Here, the breadth and weight of evidence is incontestable. The evidence supporting the claim includes incontestable findings of the Probate Part judge after a full hearing regarding the estates of Jane Sogliuzzo and Mary Grimley. In both instances the court concluded, among other things, that John Sogliuzzo had engaged in a widespread scheme to steal from his mother and cousin. The evidence further shows that John later lied to Jane Adkins that he had done nothing wrong. John engaged in this conduct with the knowledge that it would upset his sister who had

undergone brain surgery and continues to suffer for that.  John knew that his acts would trigger, and in fact it did trigger, episodes of seizures and anxiety attacks because of the emotional load that was placed on Jane Adkins because of John's reprehensible conduct.

Lastly it should be noted, as John Sogliuzzo has invoked a blanket Fifth Amendment privilege in this and all other related matters, the Court is free to draw an adverse inference regarding his conduct especially in light of the other uncontested evidence.  See *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

## B.  Based On The Intentional Conduct Of John Sogliuzzo, Jane Adkins Has Suffered Emotional Distress

A claim for intentional infliction of emotional distress is recognized by the New Jersey courts. *Zamboni v. Stamler*, 847 F.2 73, 80 (3d Cir. 1988).  The elements of the cause of action include demonstrating that a defendant acted intentionally or recklessly; the conduct was extreme and outrageous; the defendant's actions are the proximate cause of the emotional distress and that the distress suffered must be "so severe that no reasonable man could be expected to endure it." *Buckley v. Trenton Savings Fund Society*, 111 N.J. 355, 366 (1988).

Without a doubt, John Sogliuzzo engaged in a plan to steal from his mother and elderly cousin.  John was also fully aware that Jane Adkins had a serious medical issue, a brain tumor that had been successfully removed, but left Jane less than completely back to normal. He pounced on that opportunity. After the deaths of Jane Sogliuzzo and Mary Grimley, so as to avoid being caught, John concocted stories to his sister about the finances of Jane Sogliuzzo and Mary Grimley. And when Jane challenged John about his stories, John became belligerent because Jane was suggesting that John had done something wrong.  That conduct by John was not by mistake or oversight.

Nor was it an accident that after Jane was able to finally learn about the breadth of what John had done, he refused to acknowledge the wrongdoing and instead opened attacks on Jane Adkins for her efforts to recover what John had stolen. (*Id.,* Exhibit H at tr. 259-60.) He did this as spite and with the intention that Jane would become upset.

This is a classic case of intentional infliction of emotional distress on Jane Adkins by John Sogliuzzo.

**1.      The Acts Of John Sogliuzzo Were Intentional**

When John signed Jane Sogliuzzo's name to checks made payable to himself or withdrew cash from his mother's name which proceeds were used for his and his family's benefit, that was a purposeful act. (*Id.,* Exhibit B at tr. 37-41; Exhibit C at tr. 11-18.)

So too, when John knowing that his mother had intended that John and his sister would share their mother's estate equally, arranged for Jane Sogliuzzo four months before her death to alter that intention with regard to Jane's investment account, he knew exactly what he was doing was wrong and that John could further enrich himself at the cost of his sister. (*Id.,* Exhibit C at tr. 9-11.)

The similar actions of John with regard to the finances and estate of Mary Grimley were specifically deliberate. John cashed hundreds of thousands of dollars of savings bonds held by Mary allowing John to use those proceeds for his own benefit or to deposited to be used later. Just like with Jane Sogliuzzo, John wrote scores of checks to himself and family members for money to which they were not entitled. John was well aware that Mary had no family except for Jane Sogliuzzo, John Sogliuzzo and Jane Adkins heirs to the estate of Mary.  With the access to Mary's finances, John achieved his goal of cutting the others out of what Mary wanted to leave to her family. (*Id.,* Exhibit E at tr. 3-6.)  Moreover, as the executor of the Grimley estate, even

though he was required to submit an accounting he never made such a filing so as to hid the fact that he had paid himself as a beneficiary substantially more than the will provided.

John committed these unlawful acts knowing that he was hurting was his sister Jane, the only other beneficiary to their mother's will and the most prominent beneficiary of Mary's will. What is more, John engaged in the unlawful conduct to violate the express intentions of the wills of Jane Sogliuzzo and Mary Grimley.  He certainly knew of the intentions of these two women because he was trusted by to be the executor of their estates and carry out their intentions.

When John's schemes started to unravel following the death of Jane Sogliuzzo, he tried to make Jane Adkins the culprit for questioning John's stewardship of the finances of Jane Sogliuzzo and Mary Grimley. (*Id.*, Exhibit H at tr. 259-60.)  He was careful to do this in one-on-one meetings and communications with Jane so he could bully her as he had done in the past. This was intended to increase the level of stress on Jane by making her feel guilty for having accused her brother of stealing.  But John knew he had at all times he had stolen the money and had only recently been caught.

Because John has invoked the Fifth Amendment, he offers no meaningful  opposition.

## 2.     The Conduct Of John Sogliuzzo Was Extreme And Outrageous

The acts of John are nothing short of reprehensible.  Stealing from one's mother is not the norm.  An attorney stealing from his mother is even more outside the norm.  The conversion hundreds of thousands of dollars by John over the course of nearly a decade is an extreme act of avarice.  To then lie to his sister when she questioned what he had done, and instead accuse Jane of being a money grubber, only serves to reinforce that John acted without any scruples.

In a similar vein, obtaining the trust of his elderly cousin so that he could have unfettered access to pilfer her savings, while she was alive is abhorrent behavior, John abdicated his role of a fiduciary so that he could live out an expensive lifestyle to which he was accustomed.   What is

19

more, in his role of executor of the Gimley estate, and as an officer of the court, John ignored the wishes of Mary Grimley and continued to reward himself from the estate awarding himself more than two thirds of the proceeds, when he was entitled to receive but about 28 percent. (*Id.*, Exhibit E at tr. 3-6.)  This is offensive on all levels.

The overall conduct of John regarding the circumstances is best illustrated by what he told his sister:  "If you have any problem, sue me for undue influence."  (*Id.*, Exhibit B at tr. 29-30.)

Again, there is no defense that John Sogliuzzo can offer as he invokes the Fifth Amendment.

### 3. The Conduct Of John Sogliuzzo Is The Proximate Cause Of The Emotional Distress Of Jane Adkins

The seizures and anxiety attacks of Jane Adkins are linked directly to the actions of John.

There is little dispute that John Sogliuzzo engaged in a widespread campaign to convert hundreds of thousands of dollars  belonging to Jane Sogliuzzo and Mary Grimley.

Following the death of Jane Sogliuzzo in February 2008, John further advanced his illegal activities by way of a cover up of what he had stolen.  In this regard, each time when Jane Adkins confronted her brother about the finances of their mother, John was abusive and belligerent towards his sister who had done nothing wrong.

John, in many cases, insisted that the contacts be between he and Jane only with no third party witnesses.

These encounters lead to anxiety attacks and seizures suffered by Jane.  Jane made efforts to record the anxiety attacks and seizures.  (*Id.*, Exhibit F.)  Not surprisingly, the notations of anxiety attacks and seizures coincide with either contacts with John or contacts concerning issues relating to what John had done   There were at least 31 seizures in 2008 following the death of

Jane Sogliuzzo and after John's schemes were uncovered; at least 69 seizures in 2009 which follows the initial litigation with John to recover what he had stolen; about 27 seizures in 2010; and at least 31 seizures for the period January through April 2011.

On one occasion, following a meeting with John in July 2008, the stress was so severe that Jane was admitted to the hospital for treatment of anxiety and seizures for two days.  (*Id.*, Exhibit H at 27.)

During the eight separate days she was deposed in this case, Jane Adkins repeatedly suffered from seizures and anxiety attacks all brought on by the stress related to what John had done. Many of these occurred when John questioned his sister over the course of three days. (See, *Id.*, Exhibit H at tr. 27, 46, 87, 877-78, 945, 954-55, 978, 1334.)

Finally, Brenda Rolander, a Certified Nurse Practitioner, and the primary health provider for Jane has been treating Jane Sogliuzzo since 2008.  Ms. Rolander opines that the Jane Adkins has and continues to suffer from anxiety attacks and seizures brought on by the stress of dealing with John Sogliuzzo, what he has done, and Jane's efforts to address what John has done. (Declaration of Brenda Rolander, dated January 3, 2013.)

In sum, after Jane sought answers from her brother concerning the financial affairs of their mother (and later Mary Grimley), John's reaction and subsequent activities are linked to an increase number of anxiety attacks and seizures suffered by Jane Adkins to which John cannot refute.

**4.     The Emotional Distress Suffered By Jane Adkins On Account Of The Conduct Of John Sogliuzzo Is Severe**

In the course of uncovering the wide spread conversions committed by John, then his general denial of wrongdoing, then his silence on the issue and finally his insinuations that Jane

Adkins is somehow the wrongdoer, Jane Adkins has had to deal with scores of incidents of seizures and anxiety attacks. In at least one instance, Jane had to be hospitalized.

The physical and emotional injury began shortly after the death of Jane Sogliuzzo in February 2008 and has continued through the eight days of deposition that Jane Adkins had to endure in this case. This is not some fleeting or phantom injury; it is real and ongoing.

In addition, while medications prescribed to Jane are aimed at addressing the severity of the seizures and anxiety attacks, experience shows that the anxiety attacks and seizures have not been eliminated - - or even reduced - - and they may not go away. Simply put, they remain a part of Jane's life.

Finally, there is the emotional distress that John has created; a serious void between a sister and brother, the only remaining members of the core family. So too, as a result of the conduct of John, a divide has been injected between the families of Jane and John, which includes the relationships with the nieces and nephews of each other as well as all other relationships between and among the extended family. (*Id.*, Exhibit H at tr. 598-600.)

As Jane Adkins stated most poignantly at deposition following almost three days of questioning from her brother:

> [W]hen you're questioned like that, like I say, by someone I thought I knew, up until [2008] I thought my brother was somebody, and have found out that he's a complete fake.
>
> And then for him to sit here today and say I am taking his inheritance, when the facts have shown what he has been doing for many, many years, without care for wonderful people like Mary Grimley, who there is no sweeter, who I know is a saint right now, and for my mom and for [Fr.] Gerry. And in my opinion John was caring only for himself. It's shown by what he has done to me over these last couple of days. And it's just absolutely heartbreaking, and that's what I am dealing with and that's why I'm breaking down.
>
> …There's no greater love than to sacrifice your love for a friend or for a brother, and I will do that….I never felt closer to the crucified Christ as I did the first day John questioned me.

(*Id.*, Exhibit H at tr. 691-94.)

22

## CONCLUSION

For the reasons stated more fully above the Court should enter judgment in favor of Jane Adkins and against John Sogliuzzo as to the Seventh Count.

Respectfully submitted,

By:   s/Dennis F. Gleason
        Dennis F. Gleason

        CARELLA, BYRNE, CECCHI, OLSTEIN,
        BRODY & AGNELLO
        5 Becker Farm Road
        Roseland, New Jersey 07068
        (973) 994-1700

        Attorneys for Plaintiff
        Jane E. Adkins

January 4, 2013

494030

23