# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

JANE E. ADKINS,

    Plaintiff,

v.

JOHN B. SOGLIUZZO, *et al.*,

    Defendants.

Civil Action No. 09-1123 (SDW)

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON BEHALF OF JANE ADKINS

JARDIM, MEISNER & SUSSER, P.C.
30B Vreeland Road, Suite 201
Florham Park, New Jersey
(973) 845-7640

Attorneys for Plaintiff
Jane E. Adkins

I.      **FINDINGS OF FACTS**

Jane and Walter Sogliuzzo were the parents of three children. W. Gerald (Fr. Gerry), a Roman Catholic priest who died in 2003; Jane, a retired school teacher, who is married to Charles Adkins; and John Sogliuzzo, a New Jersey attorney, who is married to L. Gaye Torrance who owns a series of public relations companies.

Jane and Walter raised their children in Hoboken on Washington Street and later at 1228 Bloomfield Street, a brownstone they owned.

In the later 1990's, Walter Sogliuzzo suffered from various ailments. As a result of his poor health, Walter was no longer able to manage the family financial matters. John Sogliuzzo took control of the finances of Jane and Walter in 1998. Walter died in January 1999. After Walter's death, John Sogliuzzo assumed responsibility his mother's financial matters.

Beginning 2000, Jane Sogliuzzo faced a heightened series of health issues. During that time she was unable to sign documents due to a shoulder injury. Also at that time, Jane Sogliuzzo's had increasing issues with her COPD. As a result it became more difficult to breath, requiring her to use multiple inhalers.

Following her shoulder injury, generally on each Friday, John would go to his mother's home and write checks to pay his mother's bills signing his mother's name. In addition, in the same time frame, John would make deposits or withdrawals at her bank.

Part of the extended Sogliuzzo family was Mary Grimley who lived a few blocks away. She was the cousin of Jane Sogliuzzo and godmother to Jane Adkins. The Adkins and their sons Timothy and Kevin frequently visited to Mary and their grandmother, when the sons lived in Hoboken.

In the summer of 2002, there was a growing concern over Mary Grimley. Although she was increasingly becoming less mobile, Mary continued to hold on to her independence. At that time, Mary was 87 years old and had lived in the same apartment for her entire life. Her physical well-being had deteriorated. She had several incidents of falling down. On one particular occasion she fell lying on the floor in her apartment for several days, unable to get up, unbeknownst to anyone until she was found by Kevin Adkins. Finally in August 2002, Mary was convinced to move into the third floor apartment at 1228 Bloomfield Street.

During the course of cleaning out Mary's Garden Street apartment, Jane Adkins, Charles Adkins, John Sogliuzzo and Torrance discovered large amounts of cash belonging to Mary. The cash was found in cookie tins and various belongings of Mary in various parts of her apartment.

Together, Jane Adkins and John Sogliuzzo counted the cash, with John writing down the amounts found inside each. More than $70,000, was counted, after which John Sogliuzzo and Jane Adkins brought the cash to Mary who by then was residing at 1228 Bloomfield.

As Jane Adkins testified, John explained to Mary that it was not safe to have so much cash in her house. John further advised Mary that he would deposit the more than $70,000 into Mary's bank account, as John had been performing her banking at that time. There is no record of any cash deposits made into any of Mary's accounts of $70,000 and John never accounted for the cash.

For many years before the move to 1228 Bloomfield, Mary would do her own banking in person at the Hoboken branch of Haven Savings Bank ("Haven"). When Mary moved to 1228 Bloomfield Street, John managed of all of Mary's finances. Typically, on Friday afternoons, when he stopped by his mother's house to pay bills and do the banking for Jane Sogliuzzo, he would go upstairs to the third floor to Mary's apartment and pay Mary's few bills and do her banking. There is no evidence that Mary was seen at Haven following her move to 1228 Bloomfield in 2002.

In taking control of Mary's finances, John Sogliuzzo arranged with Haven to have him appointed with a power of attorney over Mary's accounts. (Exhibit P-59.) However, the POA is highly suspect, if not an outright fraud. Paula Ianna, the secretary at John's law office who notarized the document, testified that she never witnessed Mary Grimley signing the POA. There was no evidence that Mary actually signed POA or even was aware of it.

Going back to the 1950s, Mary and her siblings invested in U.S. Savings Bonds. All told, Mary directly and indirectly was the beneficiary of literally hundreds of savings bonds spanning decades. (See Exhibit P-64.)

Beginning as early as 2004, on more than two dozen occasions, John presented in person to Haven scores of Mary's saving bonds. There is no credible evidence that Mary signed the back of any of the bonds in the presence of bank representatives as required by terms of the bonds. Mary Perry, a representative of Haven testified that John Sogliuzzo – not Mary Grimley -- received the proceeds of Mary's savings bonds, from the bank as evidenced by the bank's receipt. (Exhibit P-64.)

During 2004-06, when most of the bonds were redeemed, Mary's doctor observed that she was confused and suffered from dementia therefore calling into question whether she was even aware of the bond redemptions. (Exhibit P-184 at tr. 23-26 and Exhibit P-116A at JD7 and JD 9.) Mary died on October 16, 2006, at the age of 91.

In 2007 and early 2008 Jane Sogliuzzo's health continued to deteriorate. She was unable to leave her home without assistance; her breathing problems increased; her eyesight continued to diminish to a point where it was difficult for her to identify even family members. In the months leading up to her death, Jane was observed as having lost interest in many of the little things she liked to do such as crossword puzzles. Jane Sogliuzzo died February 29, 2008 at the age of 93.

On March 4, 2008, a few days after the death of their mother, Jane Adkins discussed with her brother the assets of their mother. John told Jane that the only assets were their mother's brownstone and about $14,000 in Jane Sogliuzzo's bank accounts. Jane Adkins asked about their mother's investment account. John told his sister that it all went to him as a "POD" or "TOD" (i.e., payable on death) account. John first alone with his sister and then later with Charlie Adkins proposed forming a corporation for the purpose of renting out 1228 Bloomfield until John was in position to buy out Jane Adkins' share of the brownstone. The Adkins expressed little interest in that plan but said they would consider it.

Later that same day, Jane called John asking for an explanation of the POD/TOD. John said again that all the money in the investment account would come to him. This struck Jane as odd because under the will Jane Sogliuzzo, the two remaining siblings were to each receive one-half of their mother's estate.

John's story about the TOD/POD prompted Jane to examine her mother's banking records which were on the kitchen table at 1228 Bloomfield where Jane was staying. There was a second telephone call that day by Jane who wanted John to explain the irregularities Jane had found such as large checks to John and the frequent number of large checks payable to cash. John without answering any questions yelled at Jane telling her that if she had a problem then she should sue him for undue influence. Very upset after the call, the Adkins returned to Virginia.

On March 5, 2008, the next day, Timothy Adkins, who had been living in the third floor apartment of 1228 Bloomfield, encountered John Sogliuzzo, who appeared unexpectedly. After some conversation on the third floor, Timothy and John went to the first floor, where they were met by Torrance   In her arms were redweld folders and files used by Jane Sogliuzzo to store her financial records. These were ordinarily kept in the kitchen area on the first floor of 1228

Bloomfield. Torrance left carrying nothing but the folders and documents that had been on the kitchen table. (P-160 at tr. 67-80; 102.)

The Adkins returned to New Jersey at the Easter holiday in mid-March staying at 1228 Bloomfield. While there, Jane and Charlie Adkins reviewed additional documents of Jane Sogliuzzo and Mary Grimley, noting yet more irregularities such as large checks payable to John and Torrance. They also noticed financial records of Jane Sogliuzzo that had been kept by Jane Sogliuzzo in the kitchen which they had seen earlier that month were now missing . The only persons known to have access before the documents were missing were Torrance and John Sogliuzzo.

In the view of Jane Adkins, the irregularities raised additional suspicions as to how John had handled Jane Sogliuzzo's and Mary's banking matters. The questionable checks and John's lack of candor regarding the finances of Jane Sogliuzzo and Mary prompted Jane Adkins to delve further with the help of her husband's firm which had experience in forensic accounting and fraud investigations.

Although by this time expressing that he wanted all communications with Jane to be through his attorney, John insisted that only the two of them meet at Union Station, Washington, D.C. At this April 2 meeting, Jane attempted to question John about the irregularities she and Charlie had discovered concerning Jane Sogliuzzo and Mary Grimley. John instead of providing answers, made statements to Jane that lead her to cry, losing her composure in public.

John Sogliuzzo renounced his duties as executor in the summer 2008 and Jane Adkins was appointed Executrix. In September 2008, Jane Adkins, as Executrix, brought suit against her brother in New Jersey Chancery Court charging that he had exercised undue influence over their

5

mother. A final judgment was entered in favor of the estate and against John Sogliuzzo for more than $520,000, and the judgment has been affirmed on appeal.

In September 2011, on the application of Jane, John Sogliuzzo was removed as executor of the Mary Grimley estate. The Probate Part Court concluded that John had engaged in multiple acts of fraud regarding the estate including disproportionate distribution payments to himself contrary to Mary's will.

## II. CONCLUSIONS OF LAW

### A. John Sogliuzzo

The allegations against John Sogliuzzo can be grouped into two categories: misappropriations from Mary Grimley; and intentional infliction of emotional distress against Jane Adkins.

#### 1. Adverse Inferences Against John Sogliuzzo

As an initial matter, John Sogliuzzo has asserted his Fifth Amendment privilege in this action. While invoking the Fifth Amendment alone cannot be the sole basis for a finding of liability, where there is other evidence to support the allegations, that evidence combined with John Sogliuzzo's silence as well as to produce (1) financial records of Jane Sogliuzo and Mary Grimley; and (2) provide an accounting of his affairs managing their finances can support an adverse inference against him. *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1984). Thus, where there is a combination of independent evidence, the Court will draw an adverse inference against John Sogliuzzo.

#### 2. Prior adjudication against John Sogliuzzo[1]

---

[1] The Court is asked to take judicial notice.

The New Jersey Chancery Court on February 23, 2012, entered a final judgment against John in the amount of $520,414 for misappropriation of funds from his mother obtained by undue influence.

John was removed as executor of the Mary Grimley estate by the New Jersey Chancery Court in September 2011 after it was proven that he had engaged in multiple acts of fraud with regard to Mary Grimley.

Specifically citing to evidence of self dealing that court found that John had written checks to himself and at least one check to his law practice, totaling in excess of $155,000; and that the evidence showed that Torrance had received $41,000 as *inter vivos* transfers, when no other family members had ever received such sums.

### 3. Undue Influence Over Mary Grimley

Adkins contends that John, individually and as co-conspirator with Torrance, exercised undue influence over Mary Grimley, including the redemptions of more than $300,000 in U.S. Savings Bonds belonging to Mary.

Where there is an allegation of undue influence regarding *inter vivos* transfers, "a presumption of undue influence arises when the contestant proves that the donee dominated the will of the doner ... or when a confidential relationship exists between a donor and donee." *Pascale v. Pascale*, 113 N.J. 20, 30 (1988)(citations omitted); see also *Bronson v. Bronson*, 218 N.J. Super. 389, 394 (App. Div. 1987). Once a confidential relationship is established, there is a presumption of undue influence related to an *inter vivos* gift, and it is then the <u>donee who has the burden of proof showing by clear and convincing evidence</u> that there was no deception, no exercise of undue influence, that the transactions were fair, open and voluntary and that such a transfer was

7

well understood by the donor. *Pascale,* 113 N.J. at 31; see also *In re Estate of Penna*, 322 N.J. Super. 417, 424 (In *inter vivos* transfer cases … [a]ll that is needed is a confidential relationship.").

### a. Confidential relationship with Mary Grimley

It cannot be reasonably challenged that John Sogliuzzo maintained a confidential relationship with Mary. The testimony of Torrance, Kevin Adkins and Jane Adkins is that, at the very least, Mary relied on John Sogliuzzo for paying her bills and handling her banking affairs because of her physical limitations after 2002. The confidential relationship is further underscored by the fact that Mary named John as a co-executor of her will. (Exhibit JBS-37.) The delegation by Mary of her financial well-being and naming him the executor of her estate bespeaks the trust and confidence that Mary reposed in John. *Pascale,* 113 N.J. at 34.

### b. Transfers from Mary Grimley to John Sogliuzzo

In 2002, in the course of moving Mary Grimley's possessions from her Garden Street apartment to 1228 Bloomfield, more than $70,000 of cash was found throughout the Garden Street residence in cookie tins and in various articles of clothing belonging to Mary.

The unchallenged testimony is that Jane Adkins and John counted more than $70,000 found at Mary's apartment. John took possession of the cash and told Mary he would deposit it into her bank account. There is no record of any such deposit. John has not come forward to rebut as is his obligation.

Based on the uncontested evidence and the silence of John Sogliuzzo by invoking the Fifth Amendment, the Court concludes that John received an *inter vivos* transfer $70,000 contrary to law. Accordingly Jane Adkins is entitled to judgment in her favor and against John Sogliuzzo. Jane Adkins is awarded 24.8 percent plus one half of 24.8 percent of $70,000 under the terms of the wills of Jane Sogliuzzo and Mary Grimley, respectively.

Jane Adkins also charges that the redemption by John Sogliuzzo of more than $300,000 of savings bonds belonging to Mary Grimley were unlawful *inter vivos* transfers. The documents and testimony of Mary Perry of Haven show that from 2004-2006, John Sogliuzzo received $321,040.05 from the redemption of Mary Grimley's savings bonds. (Exhibit P-64.)

After she moved into the third floor apartment at 1228 Bloomfield in August 2002, Mary's ability to travel outside of 1228 Bloomfield was restricted because of her physical limitations. There was no need for her to redeem saving bonds of more than $300,000. Mary's expenses were limited primarily to small amounts for food and for the caretaker she shared with Jane.

Adkins having established a confidential relationship and the *inter vivos* transfers, the burden of proof shifted to John Sogliuzzo to prove by clear and convincing evidence that the transfers were not obtained by undue influence.

Lastly, as noted below, Sogliuzzo together with Torrance engaged in a conspiracy of undiu influence in regard to the $20,000 check from Mary.

John Sogliuzzo offered no proof either that there was no confidential relationship or that he did not receive the proceeds of the bond redemptions, as was his burden. The Court therefore concludes that judgment should be awarded in favor of Jane Adkins and against John Sogliuzzo. Jane Adkins is awarded 24.8 percent plus one-half of 24.8 percent of $321,040.05 and $20,000 under the wills of Mary Grimley and Jane Sogliuzzo respectively.

### 4. Other causes of action

Adkins also charges John Sogliuzzo with conspiracy to commit torts, breach of fiduciary duty to Mary, conversion of Mary's savings bonds, intentional fraud, and wasting another's inheritance.

9

The same evidence discussed above demonstrates that John breached his duty to Mary in regard to the $70,000 of cash found at Mary's apartment when he failed to deposit it into Mary's account; that John converted Mary's savings bonds when he received the proceeds; and that as a result of his misappropriation of the bonds, he denied Jane Adkins sums that would have been due to her under Mary's will and the $20,000 check to Torrance was unlawfully acquired.

### 5. Intentional Infliction of Emotional Distress

Jane contends that the conduct of John following their mother's death, were intentional acts which have caused Jane emotional distress.

A claim for intentional infliction of emotional distress is recognized by the New Jersey courts. *Zamboni v. Stamler*, 847 F.2d 73, 80 (3d Cir. 1988). The elements of the cause of action include demonstrating that a defendant acted intentionally or recklessly; the conduct was extreme and outrageous; the defendant's actions are the proximate cause of the emotional distress and that the distress suffered must be "so severe that no reasonable man could be expected to endure it." *Buckley v. Trenton Savings Fund Society*, 111 N.J. 355, 366 (1988).

The Chancery Court has already adjudicated that John committed the intentional tort of undue influence over his mother. John was well aware that Mary had no family except for Jane Sogliuzzo, John Sogliuzzo and Jane Adkins. Because of the equally deliberate misconduct of John with regard to the finances and estate of Mary Grimley he was removed as executor. John cashed hundreds of thousands of dollars of savings bonds held by Mary allowing John to use those proceeds for his and Torrance's benefit.

John committed these intentional acts knowing that they would cause severe emotional and financial. When John's schemes started to unravel following the death of Jane Sogliuzzo, he challenged Jane Adkins for questioning John's stewardship of the finances of Jane Sogliuzzo and

Mary Grimley. He literally told his sister to sue him for undue influence is she had a problem with his actions. Even at trial John claims that he is the "victim" because he suggests he has been derprived of his inheritance as a result of the expenses Jane incurred to uncover his scheme.

Stealing from one's mother is not the norm; it is reprehensible. The conversion of hundreds of thousands of dollars by John over the course of nearly a decade is an extreme act of avarice. Similarly, obtaining the confidence of his trusting elderly cousin so that he could have unfettered access to pilfer her savings while she was alive, is abhorrent behavior.

There is no dispute that the conduct of John proximately lead to anxiety attacks and seizures suffered by Jane. Jane made a contemporaneous record of the anxiety attacks and seizures from 2008. (Exhibit P-75). Jane established that the notations of these events coincide with either contacts with John or contacts concerning issues relating to what John had done. There were at least 31 seizures in 2008; at least 69 seizures in 2009; about 27 seizures in 2010; and at least 31 seizures for the period January through April 2011. On one occasion, the stress was so severe that Jane was admitted to the hospital for two days for treatment of anxiety and seizures. Lastly, as the Court observed first hand, the cross examination of Jane by her brother challenginging the propriety of investigation into John's wide spread scheme led to a seizure and the need to recess her cross-examination. While medications prescribed to Jane are aimed at addressing the severity of the seizures and anxiety attacks, they remain a part of Jane's life.

The Court concludes that Jane Adkins has met her burden and she is entitled to entry of judgment in her favor and against John Sogliuzzo for intentional infliction of emotional distress..

### 6. Punitive Damages

Lastly, Jane Adkins also seeks an award of punitive damages based on the egregious conduct of John Sogliuzzo. See N.J.S.A. 2A:15-5.12. Punitive damages are meant to punish

misconduct and to deter the offender and others from repeating the action. *Mancini v. Township of Teaneck*, 349 N.J. Super. 527, 568 (App. Div. 2002).

Jane Adkins is entitled to an award of punitive damages based on (1) the personal emotional harm John Sogliuzzo caused her by virtue of his eight year scheme to steal hundreds of thousands of dollars from their elderly mother and elderly cousin; and (2) malicious conduct with respect to Jane Sogliuzzo and Mary Grimley and his efforts to willfully steal and conceal Jane Adkins' rightful share of inheritance from such estate.

The New Jersey Supreme Court has observed: "[U]ndue influence represents such an egregious intentional tort that it establishes a basis for punitive damages in a common law cause of action." *In re Niles*, 176 N.J. 282, 300 (2003).

This Court concludes that punitive damages are appropriate under the circumstances of the case. The final judgment in the Chancery Court begins to show the magnitude of the conversions. Coupled with the *inter vivos* transfers of more than $300,000 of U.S. Saving Bonds belonging to Mary Grimley, it would be gainsay to relegate the acts of John Sogliuzzo as *de minimus;* they were wanton and willful. Then John, as determined by the New Jersey Chancery Court, deliberately made payments to himself from the Grimley estate disproportionate to what Mary intended and then tried to cover up all of his unlawful acts.

### B. L. Gaye Torrance

Adkins charges Torrance with conspiracy (with John) to commit torts, in particular, the exercise of undue influence over Jane Sogliuzzo and Mary Grimley and in aiding and abetting the commission of torts against both elderly women.

Civil conspiracy is shown where there is a combination of two or more persons; an agreement or confederation with common design; existence of unlawful purpose, or of lawful

purpose to be achieved by unlawful means; and proof of special damages. *Morganroth & Morganroth v. Norris McLaughlin & Marcus*, 331 F.3d 406 (3d Cir. 2003). In addition, "Proof of a conspiracy makes the coconspirators jointly liable for the wrong and resulting damages." *Id.*

Evidence was presented that Torrance and John Sogliuzzo worked together procuring checks for the tuition of their children; drawing checks on the account of Mary Grimley; and when the scheme began to unravel, removing from the home of Jane Sogliuzzo the very documents that would incriminate them.

### 1. Jane Sogliuzzo

#### a. Confidential Relationship

The trial testimony of Torrance establishes the confidential relationship she and John Sogliuzzo had with Jane Sogliuzzo. She regularly visited her mother in law; Jane Sogliuzzo would give Torrance small gifts; and on several occasions Torrance would pick up checks from Jane's investment advisor. So too, Torrance testified how in June 2005, Jane Sogliuzzo purportedly loaned Torrance $8,000 to help her out in the bankruptcy of one of the companies owned by Torrance. (Exhbit P-10.)

#### b. Conspiracy to Engage in Undue influence over Jane Sogliuzzo

Torrance testified that she and John Sogliuzzo approached Jane Sogliuzzo "to help them out" with the private school tuition for their children. Torrance contends that neither she nor John Sogliuzzo had the $15,000. According to Torrance, Jane Sogliuzzo wrote out two checks to the Pingry School on January 16, 2004 as a "gift."

There is no evidence to suggest, let alone demonstrate, that Jane Sogliuzzo ever made "gifts" to her children or grandchildren totaling even near $14,000. Indeed, Jane Sogliuzzo gave her family only modest cash gifts, about $50. A $14,000 "gift" is disrorportionate to Jane

13

Sogliuzzo's prior history. It was simply inconsistent with her past practices of small gifts to her family and treating all members of her family equally.

Apart from that, while Torrance testified that the checks came from Jane Sogliuzzo, the evidence does not support her version. Jane Adkins testified that the printing on the two checks following the "pay to the order" language is that of her brother and the signature on the checks is not that of Jane Sogliuzzo. Incredibly, Torrance claims that she does not recognize the printing of her husband of more than 30 years. John offers nothing to dispute his sister's testimony.

Once a confidential relationship with Jane Sogliuzzo was demonstrated by Adkins, Torrance was obligated to come forward with clear and convincing evidence that the gift from Jane Sogliuzzo was not obtained by undue influence. Instead, Torrance chose not introduce any evidence to refute the charge.

The Court finds that Jane Adkins has met her burden that the two checks written from the checking account of Jane Sogliuzzo to the Pingry School were obtained by undue influence. Adkins is entitled to judgment of one-half the checks to Pingry.

2. **Mary Grimley**

There is also sufficient credible evidence of a conspiracy of *inter vivos* transfers exerting undue influence over Mary Grimley.

a. **Confidential relationship**

By her own testimony, Torrance all but concedes a confidential relationship with Mary Grimley. For example, Torrance spoke about the regular visits she would make to Mary at her Garden Street apartment and later at 1228 Bloomfield. Torrance spoke about how Mary Grimley was included in Sogliuzzo family events at their Short Hills home and how Mary was accepted as part of the Sogliuzzo family.

### b. Conspiracy to Engage in Undue influence over Mary Grimley

In February 2005, Torrance received a check from Mary Grimley in the amount of $20,000. On this particular occasion, when the two of them were together in Mary's apartment, Torrance insists that Mary wrote the check out to Torrance as a "gift." (Exhibit P-37.) Torrance endorsed the check and deposited it into her individual checking account.

The notion that Mary would gift $20,000 in 2005 is highly suspect. There is no evidence that at any point in her entire life Mary Grimley wrote a check for $20,000 to any other family member. The evidence shows a very different means by which Mary would provide "gifts" to people who were close to her. Gifts made were by way of a special certificate of deposit account payable to the recipient at the time of Mary's death. And most significantly it was done without the knowledge of recipient. Indeed, that was the very means of a gift Mary made to Kevin Adkins, who regularly assisted Mary in the years he lived in Hoboken. Finally, the absence of a gift tax return by Mary lends support to the conclusion that there was no gift from Mary to Torrance.

Additionally, the check itself is questionable. It was not written or signed by Mary Grimley. Looking at the $20,000 check dated February 10, 2005, following the pay to the order of language is the name "L. Gaye Torrance" in noncursive letters. Jane Adkins testified that this is the printing of John Sogliuzzo, not Mary Grimley. Torrance has never denied this. (Compare the printing on Exhibit P-37 with the printing on Exhibit P-33.)

Torrance offered no rebuttal for purposes of showing no undue influence as she was obligated. Therefore, the Court concludes that Torrance is jointly liable as a co-conspirator for the $20,000 check; the $321,040.05 of bonds redeemed by John; and the $70,000 in cash from Mary's apartment and awards judgment in favor of Jane Adkins and against Torrance for 24.8 percent (as

a beneficiary under the Grimley will) plus one-half of 24.8 percent (as the beneficiary under Jane Sogliuzzo's will).

Lastly, Adkins is entitled to prejudgment interest to be calculated.

                                                Respectfully submitted,


By:   s/Dennis F. Gleason
        Dennis F. Gleason

        JARDIM, MEISNER & SUSSER, P.C.
        30B Vreeland Road, Suite 201
        Florham Park, New Jersey
        (973) 845-7640

        Attorneys for Plaintiff
        Jane E. Adkins

February 11, 2014

## CERTIFICATION OF SERVICE

I, Dennis F. Gleason certify that on January 11, 2014, I filed by ECF plaintiff's proposed findings of fact and conclusion of law.

                                                     s/Dennis F. Gleason
                                                      Dennis F. Gleason